Yaman Salahi (SBN 288752)
ysalahi@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Natasha J. Fernández-Silber (*pro hac vice forthcoming*)*
nfernandezsilber@edelson.com
Julian Zhu (SBN 342744)
jzhu@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 773.389.2242
Fax: 312.589.6378
* Admitted in Michigan and New York only

*Counsel for Plaintiff Panoramic Medicine and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CURTIS F. ROBINSON, M.D., INC., d/b/a/ PANORAMIC MEDICINE, on behalf of itself and others similarly situated,<br><br>*Plaintiffs*<br>v.<br><br>MULTIPLAN, INC., a New York corporation, AETNA, INC., a Delaware corporation, THE CIGNA GROUP, a Delaware corporation, and UNITEDHEALTH GROUP INCORPORATED, a Delaware corporation,<br><br>*Defendants.* | Case No. ____-cv-_____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................1

II.   PARTIES ............................................................................................6

III.  CO-CONSPIRATORS ........................................................................9

IV.   JURISDICTION AND VENUE ...................................................... 13

V.    DIVISIONAL ASSIGNMENT ....................................................... 14

VI.   FACTUAL BACKGROUND .......................................................... 15

  A.   The Out-of-Network Healthcare Services Industry. ................................ 15

    1.   Third-Party Payers and their Provider Networks. ......................... 15

    2.   Out-of-Network Care ................................................................... 18

    3.   Claims Reimbursement. ............................................................... 18

    4.   Unlike HMOs, PPOs Offer Out-of-Network Coverage. ............... 19

    5.   Competition Among PPOs for Out-of-Network Providers .............. 21

  B.   Historical Pricing of Out-of-Network Provider Services. ...................... 22

    1.   Usual and Customary Rates ("UCR") ......................................... 22

    2.   Prior Industry Collusion: The Ingenix Cartel (1997-2009) ............. 25

    3.   FAIR Health, Inc. ........................................................................ 28

  C.   Insurers Abandon UCR-Based Claims Pricing in Favor of MultiPlan. 29

  D.   The Evolution of MultiPlan's Business ................................................ 31

    1.   MultiPlan 1.0 .............................................................................. 31

    2.   MultiPlan 2.0 .............................................................................. 34

  E.   MultiPlan's Claims Pricing Services. .................................................. 35

    1.   The Data iSight Methodology ..................................................... 36

    2.   MultiPlan's Negotiation Services ............................................... 42

    3.   MultiPlan's Contingent Fee Structure. ...................................... 44

VII.  DEFENDANTS' ANTICOMPETITIVE SCHEME ....................... 44

  A.   MultiPlan invites insurers to participate in collective action. ............ 45

  B.   Insurers accept MultiPlan's invitation to collude. ............................. 48

    1.   Joint Delegation .......................................................................... 48

    2.   Anticompetitive Information Exchange ....................................... 49

    3.   Adherence to MultiPlan's Pricing Determinations ........................ 51

C.    Direct and indirect evidence of the MultiPlan Cartel exists. ............... 52

    1.    Direct evidence of a horizontal agreement. ........................................ 52

    2.    Indirect evidence of a horizontal agreement. ................................... 53

VIII.   RELEVANT MARKET AND MONOPSONY POWER .................................... 57

IX.    FRAUDULENT CONCEALMENT, CONTINUING VIOLATION, AND TOLLING THE STATUTE OF LIMITATIONS ............................................................ 58

X.    ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE ............................................................................................................ 62

XI.    CLASS ACTION ALLEGATIONS ..................................................................... 64

XII.    CAUSES OF ACTION ........................................................................................... 66

XIII.   PETITION FOR RELIEF ...................................................................................... 69

XIV.   JURY DEMAND ....................................................................................................... 69

## I.    INTRODUCTION

1.      This action is brought on behalf of a proposed Class of physicians and other healthcare providers ("Providers") to challenge a cartel among insurance companies ("Insurers")—with and through the data analytics firm MultiPlan, Inc. ("MultiPlan")—to artificially reduce reimbursement rates paid to Providers for out-of-network ("OON") healthcare claims (the "MultiPlan Cartel").

2.      The difference between "out-of-network" and "in-network" claims (and the rates at which they are reimbursed by insurers) stems from healthcare providers' contractual agreements with insurance companies.  In-network providers have agreed to accept pre-negotiated, heavily discounted contract rates for their services, which are set by the insurers, in exchange for access to their plan members (often called "patient steerage").  Conversely, out-of-network providers have declined to enter into these agreements (often because the in-network rates offered are unreasonably low) and are free to set prices based on what the market can bear.

3.      Patients often prefer (and in some cases require) treatment from out-of-network providers, including in cases of emergency, where an established patient-doctor relationship exists, where in-network options are lacking, or where highly specialized care is needed.  Given the persistent consumer demand for out-of-network care options, many insurance plans offer out-of-network coverage to plan members (or "subscribers"). In fact, out-of-network benefits are the defining feature of the nation's most popular insurance plan type: the preferred provider organization ("PPO").

4.      Relative to other plan types, like health management organizations ("HMOs"), PPOs command higher premiums in part because they afford their subscribers the freedom to see any provider of their choosing (assuming they are willing to incur increased out-of-pocket costs for out-of-network care).  HMOs, by contrast, typically only cover services performed by "in-network" providers.

5.      Under normal market conditions, insurers are incentivized to ensure that PPO subscribers (who are paying a premium relative to HMO subscribers to obtain out-

of-network benefits) have access to quality out-of-network care options, including by paying providers competitive reimbursement rates.  Insurers understand that paying below-market reimbursement rates might result in providers either (a) refusing to treat their subscribers on an out-of-network basis or (b) billing those subscribers for the portions of their claims not covered by insurance (a process known as "balance billing"). When this occurs, subscribers are functionally denied the full value of the out-of-network coverage they've paid for and may look to change plans.  To avoid losing these subscribers, insurers have a strong unilateral economic interest in paying competitive out-of-network reimbursement rates, and in competing on that basis to satisfy both subscribers and providers.

6.     However, insurers' independent, short-term economic self-interest in competing for out-of-network providers (to avoid subscriber loss) conflicts with their collective, long-term interest in reducing overall out-of-network costs.  This presents what's known as a collective action problem:  To achieve the collective goal of reducing industry-wide out-of-network costs, insurers must work together to set rates.  But such coordination is both (a) logistically complex (given the number of claims, services, and insurers involved) and (b) difficult to enforce (given each insurer's individual incentive to undercut the competition by offering better out-of-network coverage through the provision of fair, competitive reimbursement rates to providers).

7.     The MultiPlan Cartel allows insurers to overcome this collective action problem (albeit in violation of the antitrust laws).  Rather than setting their out-of-network reimbursement rates independently, most of the nation's insurers—roughly 700 out of 1,100 total (including all 15 of the largest insurers)—now outsource this rate-setting function to a common entity, MultiPlan.  By acting collectively through MultiPlan, insurers (including the Insurer Defendants) effectively eliminate competition between themselves for out-of-network provider services.

8.     As part of this scheme, insurers are required and agree to provide MultiPlan with proprietary, competitively sensitive information (including claims

pricing data and reimbursement strategies). This data enables MultiPlan to coordinate and suppress industry-wide reimbursement rates. As MultiPlan boasts, in order to set rates for the industry, it "leverages reimbursement data from millions of claims" to help insurers reprice out-of-network claims by "remov[ing] the guesswork." This is code for unlawful coordination on prices through the collection of each insurer's otherwise private and competitively sensitive reimbursement data.

9. MultiPlan purports to determine out-of-network reimbursement rates "algorithmically" through a propriety program called "Data iSight." But Data iSight is little more than a technological smokescreen for traditional price-fixing. As MultiPlan admits, the program merely calculates "median reimbursement levels." However, MultiPlan ensures that these median calculations are artificially low by feeding the algorithm junk data, including data reflecting what insurers pay providers on an in-network basis. As noted above, in-network rates reflect the steep discounts that some providers agree to offer insurers in exchange for the benefits of network participation (most notably, increased patient volume). They do not represent reasonable rates of reimbursement for out-of-network providers, who have entered into no such agreements with insurers and thus do not stand to gain the benefits of network participation.

10. To further suppress and coordinate out-of-network reimbursement levels, MultiPlan instructs many insurers, including the Insurer Defendants, to enter specific algorithmic "overrides" such as "Don't pay more than X% of the Medicare rate." The imposition of such rate caps by even a few of the largest insurers (which, given their market share, are responsible for a huge proportion of all out-of-network claims) results in rapid downward shifts in industry-wide reimbursement levels. Reimbursements paid to providers based on these artificial caps become the very data points MultiPlan then feeds its algorithm to calculate median reimbursement levels in the future. Once the market resets based upon these new, suppressed levels of reimbursement, MultiPlan can instruct insurers to enter even lower rate caps—all while assuring them

that they'll remain (in the words of one MultiPlan executive) in the "middle of the pack" as compared to competitors, thus avoiding competitive harms.

11.     MultiPlan does not stop there.  To ensure its fixed reimbursement rates hold, MultiPlan negotiates with providers on behalf of its insurer clients, who agree to honor MultiPlan's negotiated rates.  In over 95% of cases, providers accept the initial offer made by MultiPlan, and agree as a condition of payment not to balance bill patients for the unpaid portions of claims.  As a result, in virtually all cases, the MultiPlan rate determination is the final rate of reimbursement, not a mere "recommendation" to the insurer.

12.     MultiPlan points to high provider acceptance rates as proof that its reimbursements are reasonable.  But what they actually signal is the existence of a cartel (and that cartel's collective market power).  Providers are forced to accept unprecedently low reimbursement rates (and to relinquish their right to balance bill) because virtually all patients are now covered by insurers who coordinate their behavior through MultiPlan.  The leverage that out-of-network providers once had—which was premised on the ability to discipline individual insurers through balance billing and service refusal—is gone.  That providers have no alternatives confirms that the MultiPlan Cartel has significant market power; the threat of competition is virtually non-existent and thus incapable of disciplining the behavior of cartel members.

13.     The MultiPlan Cartel has resulted in the dramatic suppression of out-of-network reimbursement rates. The traditional method of calculating OON reimbursement rates is based on "usual, customary, and reasonable" provider charges, or "UCR."  Under this method, the UCR rate for a particular service is determined by surveying the amounts providers in a particular geographic market charge for the same or similar medical services and then selecting an allowable charge amount.  Insurers may calculate this number as they see fit, but typically the UCR rate was set at around the 80th percentile of what doctors in the same market charge for a particular service. Today, UCR rates are calculated from objective data compiled by the independent non-

profit organization, Fair Health, Inc. ("FAIR"). Unlike MultiPlan, FAIR charges a flat annual fee to insurers, and is not compensated based on how low it calculates UCR rates to be.

14.    MultiPlan, however, has changed the rules of the game by replacing the UCR method with its own price-coordination scheme. That strategy has paid off for the Cartel. According to an April 2020 study published by the Office of the New York State Comptroller, depending on the service provided, reimbursements based on MultiPlan's repricing methodology were 1.5 to 49 times lower than reimbursements for the same services based on the traditional method of calculating rates (*i.e.*, UCR). And whereas prior to 2016, reimbursement rates typically rose over time, since 2016, they have fallen each year because of MultiPlan's price-coordination scheme. Rather than inure to the benefit of customers and insureds, these "savings" benefit insurance company executives and stockholders.

15.    Meanwhile, providers are forced to accept increasingly low reimbursement amounts for out-of-network services, which often do not even cover their operating costs. Low out-of-network reimbursement rates can also indirectly suppress in-network rates, as providers' ability to profitably treat patients on an out-of-network basis is crucial for negotiating better in-network rates. By undermining the economic viability of billing on an out-of-network basis, insurers strip providers of this leverage, further entrenching lower in-network reimbursement rates. These dynamics have forced many practices, particularly smaller ones, to shut their doors, to cease offering certain services, or to join massive hospital conglomerates, leaving patients with fewer and fewer healthcare options.

16.    MultiPlan has a direct economic stake in this race to the bottom. For each claim it reprices, MultiPlan receives a fee from the insurer based on a percentage of the difference between the initial claim amount and what the insurer pays. In other words, MultiPlan gets paid more as providers get paid less. The revenues generated by MultiPlan from its repricing services have gone from $23 million in 2012, to $564

million in 2020 and $709 million in 2021.  Insurers choose to pay MultiPlan's high fees to facilitate their rate-fixing scheme.

17.    The MultiPlan Cartel dates to roughly 2015, but it is not the first scheme by insurers to suppress out-of-network reimbursement rates.  From the late 1990s to roughly 2009, insurers fixed these rates through a UnitedHealthcare subsidiary, Ingenix, Inc. ("Ingenix"), which functionally calculated UCR rates for the industry.  But as a New York Attorney General's Office ("NYAG") investigation revealed, Ingenix was systematically understating UCR, including by polluting its claims database with discounted in-network payments, as MultiPlan does today.  The Ingenix scheme artificially suppressed OON reimbursement rates by 10-28%, leading to massive liability.  In 2009, twelve insurers (including the "big four"—Blue Cross/Blue Shield, United, Cigna, and Aetna) settled with NYAG.  They agreed to invest hundreds of millions of dollars in the creation of a new, independent UCR database to replace Ingenix—which would become FAIR—and refrain from developing or using any alternative to FAIR for at least five years.  The five-year terms of those settlements ended in 2015 and 2016.  When those bans lapsed, insurers shifted away from FAIR (and from UCR entirely) and began to fix rates again via MultiPlan.

18.    The conspiracy challenged herein is unlawful under Section 1 of the Sherman Act.  Plaintiff brings this action to recover damages, trebled, as well as injunctive and other appropriate relief, detailed *infra*, on behalf of itself and all others similarly situated.

## II.    PARTIES

19.    Plaintiff Curtis F. Robinson M.D., Inc., doing business as (d/b/a) Panoramic Medicine ("Panoramic Medicine" or "Plaintiff"), is a California corporation located in Mill Valley, California.  Panoramic Medicine is an independently-owned and operated primary care practice founded and run by Mill Valley-native Curtis Robinson, M.D.  Panoramic Medicine supports individual and community health, wellness, and longevity through the provision of cutting-edge primary medical care.  While Panoramic

Medicine participates in several insurance networks, it sometimes treats patients on an out-of-network basis. For these patients, Plaintiff submits out-of-network claims for reimbursement, including to insurers who use MultiPlan's out-of-network claims repricing services and are members of the MultiPlan Cartel. Plaintiff has received unreasonably low rates of reimbursement on those claims as a result of the unlawful price-fixing conspiracy alleged herein.

20.    Defendant MultiPlan, Inc. ("MultiPlan") is a New York corporation. Its principal place of business is located at 115 Fifth Avenue, 7th Floor, New York, NY 10003. MultiPlan is wholly owned by MultiPlan Holding Corporation. The ultimate parent company of MultiPlan Holding Corporation is MultiPlan Corporation. MultiPlan Corporation is a publicly traded entity. MultiPlan, which purports to be a third-party out-of-network claims repricing service, serves as the conduit by which cartel members share, *inter alia*, detailed, competitively sensitive, non-public information.

21.    MultiPlan has a number of subsidiaries, including Viant, Inc. ("Viant"), a healthcare cost management company incorporated in Nevada and headquartered in Illinois, which MultiPlan acquired in 2010; and healthcare cost management companies National Care Network, LP, incorporated and headquartered in Texas, and its affiliate National Care Network, LLC, incorporated in Delaware and headquartered in Texas, which MultiPlan acquired in 2011.

22.    Until October 2020, MultiPlan was a privately held corporation. In October 2020, Churchill Capital Corp. III and its related entities acquired MultiPlan, Inc. and its related entities. Churchill Capital Corp. III is a special-purpose acquisition company created to raise funds to take a private company public. It is incorporated in Delaware and headquartered in New York. After completing the acquisition of MultiPlan, Inc. and its related companies, Churchill Capital Corp. III changed its name to MultiPlan Corporation.

23.     Defendant Aetna, Inc. ("Aetna"), a subsidiary of CVS Health Corporation, is one of the largest commercial health insurance payers in the United States.  It has a commercial insurance network that pays in-network and out-of-network claims from healthcare providers in all 50 states and the District of Columbia.  It is a Delaware corporation headquartered in Hartford, Connecticut.  Aetna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States.  Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  Aetna is a member of the MultiPlan Cartel and began using MultiPlan's out-of-network claims repricing services in May 2015.

24.     Defendant The Cigna Group ("Cigna") is one of the largest health insurance companies in the United States. It is a corporation organized under the laws of the State of Delaware, with its principal place of business in Broomfield, Connecticut. Cigna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States.  Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  Cigna is a member of the MultiPlan Cartel and began using MultiPlan's out-of-network claims repricing services in 2015.

25.     Defendant UnitedHealth Group Incorporated ("UnitedHealth") is one of the largest health insurance companies in the United States.  It is a Delaware corporation with a principal place of business in Minnetonka, Minnesota.  UnitedHealth has two divisions: UnitedHealthcare, which provides health benefits plans, and Optum, which provides health services, including pharmacy benefit manager services.

UnitedHealth is a vertically integrated healthcare enterprise with a portfolio of wholly owned subsidiaries comprising a massive healthcare ecosystem. These subsidiaries include the largest commercial health insurance company in the United States, UnitedHealthcare. UnitedHealthcare has a commercial insurance network that pays in-network and out-of-network claims from healthcare providers in all 50 states and the District of Columbia. UnitedHealth's insurance plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service-only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. UnitedHealth is a member of the MultiPlan Cartel and began using MultiPlan's out-of-network claims repricing services in 2016.

26.     Aetna, Cigna, and UnitedHealth are collectively referred to in this complaint as the "Insurer Defendants." They have each executed an out-of-network claims repricing services agreement with MultiPlan and have participated in the MultiPlan price-fixing Cartel. Each has performed acts and made statements in furtherance of the conspiracy. Accordingly, along with MultiPlan, the Insurer Defendants are jointly and severally liable for all the acts and omissions of their co-conspirators, whether named or not named in this complaint.

## III.        CO-CONSPIRATORS

27.     The named Defendants are not the only participants in the MultiPlan Cartel. MultiPlan sets out-of-network reimbursement rates for nearly all major health insurers in the United States, and many of the smaller ones. It has bragged that it contracts with some 700 health insurance companies and payers—including the 15 largest health insurers in the United States—to provide out-of-network claims repricing services.

28.     The conspiracy alleged herein includes any person or entity that has entered into an out-of-network claims repricing services agreement with MultiPlan, used MultiPlan's out-of-network claims repricing tools to process claims for out-of-

network healthcare services, or otherwise participated with the Defendants in the alleged anticompetitive conspiracy and performed and made statements in furtherance of the conspiracy.

29.    Defendants are jointly and severally liable for the acts of these co-conspirators, whether or not they are named as defendants in this complaint, including but not limited to:

30.    Blue Shield of California Life & Health Insurance Company ("BSCA") is a health insurance company.  It is a California corporation with a principal place of business in California.  BSCA is a licensee of the Blue Cross and Blue Shield Association and is license to offer Blue Cross and Blue Shield-branded health insurance plans in California.  Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self- funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  BSCA is a member of the MultiPlan Cartel.  On information and belief, BSCA began using MultiPlan's out-of-network claims repricing services around the same time as the other Insurer Defendants.

31.    Blue Cross and Blue Shield of Florida, Inc. ("BCBSFL") is a health insurance company.  It is a Florida corporation with a principal place of business in Florida.  BCBSFL is a licensee of the Blue Cross and Blue Shield Association and is license to offer Blue Cross and Blue Shield-branded health insurance plans in Florida.  Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  On information and belief, BCBSFL is a member of the MultiPlan Cartel.

32.    Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSMI") is a Michigan mutual insurance company.  Its principal place of business is

in Michigan.  BCBSMI is a licensee of the Blue Cross and Blue Shield Association and is license to offer Blue Cross and Blue Shield-branded health insurance plans in Michigan.  Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  On information and belief, BCBSMI is a member of the MultiPlan Cartel.

33.    Centene Corporation ("Centene") is one of the largest health insurance companies in the United States.  It is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Centene is the parent company, or is otherwise affiliated or related, to various commercial health insurance plans and prescription drug plans operating in the United States.   Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  On information and belief, Centene is a member of the MultiPlan Cartel.

34.    Elevance Health, Inc. (formerly known as Anthem, Inc.) ("Elevance") is one of the largest health insurance companies in the United States.  Elevance is a member of the Blue Cross and Blue Shield Association, a joint venture of insurance companies that work together to offer their members access to a nationwide network of healthcare providers.   It is an Indiana corporation with a principal place of business in Indianapolis, Indiana.   Elevance licenses certain trademarks and service marks from the Blue Cross and Blue Shield Association in 14 states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, most of Missouri, Nevada, New Hampshire, parts of New York, Ohio, Virginia (except the Washington, D.C. suburbs), and Wisconsin.   Elevance is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States.   Those plans issue insurance or provide

administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  On information and belief, Elevance is a member of the MultiPlan Cartel.

35.    Health Alliance Medical Plans, Inc. ("Health Alliance"), a subsidiary of Carle Clinic Association, is a health insurance company.  It is a corporation organized under the laws of Illinois with a principal place of business in Illinois.  Health Alliance offers health insurance plans in Illinois, Iowa, Indiana, and Ohio, and its sister company, Health Alliance Northwest, offers health insurance plans in Washington. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  On information and belief, Health Alliance is a member of the MultiPlan Cartel.

36.    Health Care Service Corporation, a Mutual Legal Reserve Company ("HCSC") is one of the largest health insurance companies in the United States.  It is organized as a mutual reserve company under the laws of the state of Illinois with a principal place of business in Chicago, Illinois.  HCSC licenses certain trademarks and service marks of the Blue Cross and Blue Shield Association and does business in Illinois as Blue Cross and Blue Shield of Illinois.   HCSC is the parent company, or is otherwise affiliated or related, to various commercial health insurance plans and prescription drug plans that operate in the United States, including in Illinois, Montana, New Mexico, Oklahoma, and Texas.   Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  On information and belief, HCSC is a member of the MultiPlan Cartel.

37.     Humana Inc. ("Humana") is one of the largest health insurance companies in the United States.  It is a Delaware corporation with its principal place of business in Louisville, Kentucky.  Humana is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States.   The plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service-only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.  On information and belief, Humana is a member of the MultiPlan Cartel.

38.     Kaiser Permanente LLC ("Kaiser") is one of the largest U.S. health insurance companies in the United States.  It is a California corporation with a principal place of business in Oakland, California.  Kaiser is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans that operate in the United States.  The plans issue insurance in the form of (1) fully insured commercial health insurance plans; (2) self-funded administrative service only health plans; (3) Medicare Advantage plans; and (4) Medicaid plans.  On information and belief, Kaiser is a member of the MultiPlan Cartel.

## IV.     JURISDICTION AND VENUE

39.     This case arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26).  Plaintiff seeks treble damages for their injuries, and those suffered by members of the proposed Class, resulting from Defendants' anticompetitive conduct; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States.

40.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question) and § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive

of interest and costs, and at least one member of the proposed Class is a citizen of a state different from that of each Defendant.

41.    This Court has personal jurisdiction over MultiPlan because it transacts business throughout the United States, including in this district (including repricing claims for OON healthcare services performed in this district); and is engaging in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

42.    This Court has personal jurisdiction over the Insurer Defendants because each of them transacts business throughout the United States, including in this district (including providing reimbursements for OON claims for healthcare services performed in this district), and engages in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

43.    Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because certain unlawful acts by the Defendants were performed in this district, and those and other unlawful acts caused harm to interstate commerce in this district.  No other forum would be more convenient for the parties and witnesses to litigate this case.

## V.    DIVISIONAL ASSIGNMENT

44.    Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San Francisco Division because a substantial part of the events or omissions giving rise to the claim occurred within the County of Marin.

1

## VI.    FACTUAL BACKGROUND

### A.    The Out-of-Network Healthcare Services Industry.

#### 1.    Third-Party Payers and their Provider Networks.

45.    Roughly 90 percent of U.S. healthcare expenses—including those related to out-of-network care—are paid for not by patients themselves, but by an assortment of public and private third-party payers ("TPPs"), often referred to as "insurers." Third-party payers include government-funded insurance programs (like Medicare and Medicaid); self-insured employers (whose plans are typically administered by commercial insurance companies); and commercial insurance companies themselves (such as UnitedHealthcare, Anthem, Aetna, Humana, Cigna, and the various Blue Cross/Blue Shield companies).



Source: Reinhardt UE. *The Money Flow From Household to Health Care Providers* (2011)[4]

46.    Most healthcare providers depend upon reimbursements from insurers to stay in business. Typically, providers collect only nominal amounts from patients at the point of service (usually in the form of "copays" or "co-insurance"). They then submit the bill (or "claim") for services rendered to the patient's insurer to obtain payment.

47.    All medical claims submitted to insurance use the same set of uniform billing codes.  Procedure code sets like CPT ("Current Procedure Terminology") and ICD-10-PCS ("International Classification of Diseases, 10th Revision, Procedure Coding System") tell the payer *which* service the provider performed.  Diagnosis codes sets like the ICD-10-CM ("International Classification of Diseases, 10th Revision, Clinical Modification") tell the payer *why* the patient received the service.  Most claims contain numerous codes, reflecting each diagnosis and treatment administered during a medical visit.  Typically, providers receive reimbursement for each code billed (so long as it is covered by the patient's healthcare plan).

48.    Healthcare providers often employ administrative professionals called "billers" and "coders" to extract billing information from patients' medical charts, generate the claims that are submitted to insurance, and ensure that the proper reimbursement amounts are received.  Many providers also employ third-party clearinghouses to pre-screen claims, correct errors, and securely transmit them to insurers (and patients).

49.    Insurers seek to predict and, if possible, limit the prices they will pay for medical services.  To that end, most insurers maintain "networks" of healthcare providers who have agreed to offer one or more insurers discounted rates for services in exchange for (a) access to their subscribers (often called "patient steerage") and (b) the avoidance of certain administrative burdens associated with negotiating the cost of services with insurers on an ad hoc basis.

50.    Network agreements between providers and insurers typically detail the kinds of services to be covered by the insurer, the amount the provider will be reimbursed for each covered service, and the process by which claims for reimbursement are adjudicated.

51.    Network agreements contain proprietary, competitively sensitive terms, including agreed-upon rates that result from closed-door negotiations between insurers

and providers.[1]  Insurers seek to protect the rates and other information in their network agreements from disclosure.  They know that competing insurance companies may use the information to lure providers to their networks by offering superior terms (which in turn drives up in-network rates for the industry); they also know that healthcare providers may leverage the information to demand more favorable rates during future negotiations.  Moreover, public disclosure of negotiated rates can lead to subscriber backlash if negotiated discounts do not result in lower plan premiums.  Given these sensitivities, the industry has taken the position that agreed-upon rates under in-network agreements are trade secrets.

52.    The in-network rates insurers offer providers—even for the same services—vary widely.  Hospitals, with their extensive service offerings and substantial market presence, typically command higher reimbursement rates from insurance companies, whereas independent practices, due to their smaller size and limited bargaining power, typically secure far less favorable in-network rates.  In many cases, the in-network rates offered fall below the operational costs incurred by providers: as one recent study by the American Medical Group Association reports, the median loss for medical groups was $249,000 per physician.  A provider in this situation is then faced with a difficult decision:  They can accept inadequate in-network rates, knowing that doing so may leave them in financial extremis.  Or they can decline to join some or all insurance networks (knowing it will result in the loss of patient volume), which allows them to bill patients' insurance plans (assuming those plans have out-of-network benefits) at the prevailing market rate.

---

[1] Prior to 2022, in-network rates were virtually always treated confidential and proprietary.  In 2022, federal legislation went into effect requiring insurers to disclose the terms of certain network agreements with hospital.  Transparency in Coverage, 85 Fed. Reg. 72158 (Nov. 12, 2020) (to be codified at 26 C.F.R pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147; and 45 C.F.R. pt. 158).

1

             **2.      Out-of-Network Care**

2           53.    Many providers refrain from participating in network arrangements for

3 one, some, or all insurers.  Some providers determine that the in-network rates offered

4 by insurers are too low (which is often the case for independent practices), or that the

5 network will not provide them with adequate patient volume to justify the requested

6 discounts.  Other providers refuse to join certain networks because of the

7 administrative burden and expense associated with obtaining in-network

8 reimbursement.

9           54.    Claims submitted to an insurer for healthcare services covered by a

10 network agreement are called "in-network" or "contracted" claims.  Claims for services

11 not covered by a network agreement are called "out-of-network," "non-contracted," or

12 "retail" claims.

13          55.    The ability of providers to submit out-of-network claims in this way, obtain

14 fair reimbursements for them, and profitably practice medicine outside of insurance

15 networks represents a powerful form of leverage on the side of providers in negotiating

16 in-network rates.  It functions, essentially, as a check on insurers' ability to drive in-

17 network rates too low.  However, as described herein, the MultiPlan Cartel drastically

18 reduces providers' leverage in this regard by suppressing out-of-network

19 reimbursement rates far below competitive levels, such that the threat of any provider

20 going out-of-network becomes increasingly hollow.  This, in turn, indirectly suppresses

21 in-network rates as well.

22             **3.      Claims Reimbursement.**

23          56.    The reimbursement process for in-network claims is relatively

24 straightforward.  Once the insurer receives a claim from an in-network provider, the

25 claim enters the adjudication process, during which the claim will either be "accepted"

26 (meaning paid), "denied" (not paid), or "rejected" (returned due to error).  If some but

27 not all of the services reflected in the bill are covered by the insurer's plan, the insurer

28 may approve the covered costs while rejecting the non-covered costs.

57.   Following adjudication, the insurer submits a report to the provider detailing which codes it is willing reimburse and at what rate (according to parties' network agreement).  The provider then checks the report for accuracy and may begin an appeals process (the procedure for which is governed by the network agreement) should a dispute arise.

58.   In contrast, when a provider is out-of-network, there is no contract between the insurer and the provider to govern the parties' obligations to one another, how claims are adjudicated, or the means for resolving any disputes over such claims. Nor is there an obligation on the part of the provider to render out-of-network services to an insurer's members, with certain limited exceptions (like emergency care).  In the absence of such an agreement, the insurer and provider are left to negotiate what services will be paid for, and in what amount, on the free market.

### 4.   Unlike HMOs, PPOs Offer Out-of-Network Coverage.

59.   Not all insurance plans cover out-of-network services, and those that do are typically priced at a premium.  The two most common of forms of health insurance in the United States are health maintenance organizations ("HMOs") and preferred provider organizations ("PPOs").  Both employ provider networks to manage costs. However, HMOs require patients to obtain healthcare services only from providers that participate in the plan network, and who have agreed to offer steeply discounted prices to plan members.[2]  PPOs, by contrast, give patients a choice:  They can either obtain care from a cost-effective in-network provider (and receive the maximum reimbursement from the insurer under their plan) or they can get care from an out-of-network provider of their choosing (and receive a reduced though still significant reimbursement amount).

---

[2] An HMO plan may, at times, provide partial reimbursement for services performed by a healthcare provider not within network, but only in extraordinary circumstances. Such coverage typically requires prior authorization by the insurer, which will pre-negotiate the terms of reimbursement with the provider.

60.     Under most PPO plans, insurers agree to pay a large, fixed percentage (typically 80-90 percent) of the expected charge of out-of-network care, which insurers typically refer to as the "usual, customary, and reasonable" (or "UCR") rate, less the patient's cost-share contribution.  The UCR rate, as described further below, is supposed to be fair reflection of the market rate for a given service in a particular geographic area.

61.     Because the insurer does not have a contract with the out-of-network provider, the consumer is financially responsible for paying the balance of the bill (*i.e.*, the portion of the bill the insurance company does not pay).  And the provider may, as a matter of law (with some limited exceptions), pursue the remainder of its charge from the consumer, regardless of how little or how much the insurer reimburses the consumer.[3]

62.     The option to see out-of-network health insurance providers comes at a cost to subscribers.  PPO premiums (and deductibles) are significantly higher on average than those for HMOs.  For example, for a 30-year-old, the average PPO plan established under the Affordable Care Act costs about $800 more per year than the average HMO plan.  Nevertheless, PPOs are the most common plan type in the United States, with nearly half of all insured U.S. employees covered by a PPO, reflecting payers' and patients' preference for increased provider choice.

63.     There are many reasons consumers may choose to pay higher premiums and deductibles for the option of seeing out-of-network providers.  After changing employers, a person may wish to continue working with certain providers, like a long-standing primary care physician, even if those providers no longer participate in the insured's new healthcare plan.  Other patients know that they have a medical condition

---

[3] Recent legislation has placed prohibitions on balance billing for emergency care and for certain out-of-network care performed at an in-network facility. *See* Requirements Related to Surprise Billing, 87 Fed. Reg. 52618 (Aug. 26, 2022) (to be codified at 26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; and 45 C.F.R. pt. 149).

that requires specialized treatment that may only be available from out-of-network providers. Geography is also a factor, as convenient in-network options are often limited for those who travel frequently or who live in rural areas. And many consumers wish to protect themselves financially in the event of a new diagnosis or emergency, when obtaining in-network care may be impossible or inferior to other options.

64.    And insurers understand why out-of-network coverage appeals to U.S. consumers. That's why they market PPOs with labels like "freedom" and "choice." Yet, behind the scenes, they do everything possible to under-reimburse the out-of-network providers who make PPO plans desirable in the first place.

**5.    Competition Among PPOs for Out-of-Network Providers**

65.    In a competitive market, insurers that sell plans with out-of-network benefits are incentivized to ensure that plan subscribers can obtain services from out-of-network providers. To do so, insurers must, at a minimum, pay out-of-network providers competitive reimbursement rates.

66.    Insurers know that a provider who receives below-market reimbursement amounts for out-of-network care may, in response, refuse to serve their members in the future, or elect to balance bill those patients for the uncovered portions of their out-of-network claims. When this occurs, subscribers are harmed financially, and may decide that their plans' out-of-network benefits are overpriced (or even illusory). This may lead them to switch to a competing PPO. The industry often refers to this as member and provider "abrasion."

67.    Given the risk of such "abrasion," under normal market conditions (*i.e.*, absent a market restraint), it would be economically irrational for an individual insurer to lowball out-of-network providers with below-market reimbursements. Insurers would instead compete against each other for out-of-network provider services to keep their current PPO subscribers happy (and obtain new ones), including by offering competitive reimbursement rates on out-of-network claims.

68.    But as set forth in further detail below, such competition has been largely eliminated by the MultiPlan Cartel.  Insurers now act collectively, though MultiPlan, to slash out-of-network reimbursement rates.  Absent an assurance that their competitors are doing the same thing, individual insurers would not lowball out-of-network providers in this way for fear of creating subscriber and provider abrasion.  The MultiPlan Cartel provides them with that assurance.

**B.    Historical Pricing of Out-of-Network Provider Services.**

**1.    Usual and Customary Rates ("UCR")**

69.    Historically, normal competitive pressures (along with inflation and other factors) tended to drive up the price of out-of-network care over time.  But the insurance industry had a system in place to ensure that they would not be on the hook for excessive provider pricing: UCR.

70.    For decades, and until the late 1990s, health insurers based out-of-network reimbursements on statistical benchmarks for medical costs based on prevailing market rates, *i.e.*, the retail prices charged by doctors in particular geographic areas.  These benchmarks are collectively referred to as the "usual, customary, and reasonable" ("UCR") rates, or sometimes just "reasonable and customary" rates ("R&C").

71.    Historically, UCR rates were calculated using data from two databases: the Prevailing Healthcare Charges System ("PHCS") and Medical Data Resource ("MDR").  PHCS was created in 1973.  Until the late 1990s, it was run by then the then-insurance industry trade organization, Health Insurance Association of America ("HIAA").[4]  MDR was created in 1987; until the late 1990s, it was run by Medicode.

72.    Insurers and providers have always understood that the UCR rate refers to the "the prevailing rate doctors charge when they have not negotiated a lower rate

---

[4] HIAA later merged with another industry trade association, the American Association of Health Plans ("AAHP") to form America's Health Insurance Plans ("AHIP"), of which the executives of many of the Insurer Defendants and co-conspirators in this case are high-ranking board members.

with the insurer on an in-network basis."[5]  That's because when a doctor (or other

professional) provides services on an out-of-network basis, they do not receive the

promise of increased patient volume and other benefits (like prompt and predictable

payment) that come with contracting to participate in an insurer's network.  In the

absence of increased volume or other contractual inducements, providers would not

offer discounts to payers, and payers would not expect to pay substantially less than the

retail charge amount.  Therefore, pre-negotiated, discounted, in-network rates do not

and have never represented reasonable rates of reimbursement for out-of-network

claims, and have never been relevant to the proper calculation of UCR rates.

73.    Accordingly, to properly calculate UCR rates, insurers historically used

aggregated, retail medical charge data (not reimbursement or payment data) for like

healthcare services performed in the same geographic markets.  Based on this

aggregated charge data, each insurer exercised its own independent judgment to

determine the applicable UCR rate for a particular medical service (often referred to as

the "allowed amount" by insurers).  Each insurer then exercised its own independent

judgement to determine what proportion of the UCR rate to cover for plan subscribers,

which the insurer included in its plan documents to notify subscribers.

74.    Historically, many insurers employed the 80th percentile rule to calculate

UCR rates.  This method is based on the distribution of charges for similar medical

services within a specific geographic area; it pegs the UCR rate to the charge amount

below which 80% of all submitted charges fall.  For example, if, after analysis, the 80th

percentile charge for a colonoscopy in a particular geographic area is identified as

$1,200, this figure becomes the UCR rate for that service in that market.  This approach

aims to ensure that UCR rates reflect prevailing market rates (covering the majority of

charges up to the 80th percentile), while eliminating higher outlier charges.

---

[5] *Deceptive Health Insurance Industry Practice: Are Consumers Getting What They Paid For?* (Part I): S. Hr'g. 111-37 Before S. Comm. on Commerce, Science, & Transportation, 111th Cong. 5 (2009).

75.    Determining UCR rates in this way does not mean that insurers pay providers the entire UCR rate.  Instead, insurers would typically cap reimbursement at 80-90% of the UCR rate and require that the subscriber to pay the remainder as co-insurance.  For example, an insurer that promised plan members that it would reimburse out-of-network claims at 80% of the UCR rate would pay the lower of the actual billed charge or 80% of the UCR rate for similar procedures in the same geographic area; the patient would then contribute the remaining 20% of the UCR rate as co-insurance.  The obligations of both insurers and patients were thus pegged to the UCR rate.

76.    A hypothetical example of how reimbursement would be calculated under this method is as follows:   A physician submits a $1,350 bill for a colonoscopy for a patient who has a PPO insurance plan with out-of-network benefits that (a) follows the 80th percentile rule to set UCR rates and (b) caps the allowed amount for out-of-network claims at 80% of the UCR rate.  The insurer accesses data from a UCR database for other colonoscopies performed in the same geographic location.  The data shows there were 10 other colonoscopies performed in that region, which were billed at $500, $600, $700, $800, $900, $1,000, $1,100, $1,200, $1,300, and $1,400.  These charges are then organized from lowest to highest to determine percentiles:

| Procedure | Percentile | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 20th | 30th | 40th | 50th | 60th | 70th | 80th | 90th |
| Colonoscopy | $600 | $700 | $800 | $900 | $1,000 | $1,100 | $1,200 | $1,300 |

77.    At the 50th percentile, half of the charges recorded in the database are lower, and half are higher.  At the 70th percentile, 70% of recorded charges are lower, and 30% are higher.  In this hypothetical, because the insurer uses the 80th percentile rule to calculate UCR rates, the UCR rate for colonoscopies in this geographical area is $1,200.  As such, the plan would reduce the physician's billed charge from $1,350 to $1,200.  Then, the insurer would pay 80% of that amount, or $960. The patient is then obligated to pay the remaining 20% of that $1,200 charge, or $240, as co-insurance.

78.    Once a healthcare provider receives notice from an insurer of the allowed amount of a claim, that provider has the option of seeking additional reimbursement from the patient for the amount of the charged bill above the allowed amount.  This is known as "balance billing."  Using the above hypothetical again as an example, the doctor could bill the patient for the $150 difference between its charged claim ($1,350) and the allowed amount ($1,200).

79.    The UCR system represented a means of normalizing healthcare costs. As William Marino, former President and CEO of Horizon Blue Cross Blue Shield of New Jersey, explained to the U.S. Senate Committee on Commerce, Science and Technology in 2009, UCR was "designed to permit payment amounts that would be predictable, change with market-based changes in prevailing payments, and keep insurance costs in check by eliminating excessive charges from the insurance pool."

80.    In other words, UCR gave the insurance industry a means of combatting what some insurers claimed were excessive charges for medical care, while still adequately compensating providers.  Despite having a means to control costs in a fair and reasonable way, insurers have, at various points, resorted to anticompetitive tactics to further reduce out-of-network costs.

**2.    Prior Industry Collusion: The Ingenix Cartel (1997-2009)**

81.    In many ways, the MultiPlan Cartel is the modern-day incarnation of a prior collusive effort by insurers to suppress out-of-network reimbursement rates: the Ingenix Cartel.

82.    Between 1997 and 1998, a UnitedHealth Group subsidiary called Ingenix purchased the two then-existing claims databases used for the calculation of UCR: MDR and PHCS.  It then consolidated those databases in 2001.  With UnitedHealth's acquisition of all UCR claims databases, one of the largest insurance companies in the nation became functionally responsible for the way the entire industry would be setting UCR rates (and, in turn, nationwide reimbursement levels for out-of-network claims).

83.  Allowing an insurance company to control the nation's sole UCR database was a massive conflict of interest. Ingenix was incentivized to skew its aggregate claims data downwards in order to reduce apparent UCR rates—and that is precisely what it did. Every dollar saved on out-of-network reimbursements based on Ingenix's claims data represented increased profits for UnitedHealth, as well as for its rivals in the insurance industry.

84.  For more than a decade after UnitedHealth's acquisition of the nation's UCR data infrastructure, the health insurance industry overwhelmingly used Ingenix data to set reimbursement rates for out-of-network claims. But in the late 2000s, providers and consumers began to complain about uncharacteristically low out-of-network claims reimbursement rates, which resulted in doctors balance billing patients for huge sums. These complaints spurred several investigations and lawsuits over Ingenix's practices, which eventually revealed that Ingenix was systematically manipulating its data with the purpose and effect of reducing apparent UCR rates.

85.  Ingenix achieved this effect in several ways. First, Ingenix commingled charge data on claims submitted under network agreements (which reflected discounted in-network rates) with data reflecting out-of-network retail charges. As noted above, in-network rates do not represent reasonable rates of reimbursement for out-of-network claims because when a provider performs services on an out-of-network basis, it does not receive any of the contractual benefits associated with network participation (*i.e.*, increased patient volume). By improperly including heavily discounted in-network charges in its claims database, Ingenix systematically and artificially depressed the apparent prevailing market rates for services, and, in turn, the calculation of UCR rates.

86.  Second, Ingenix removed higher-end claims from its databases using formulaic edits to identify and purge roughly 5% of all submitted charges without first investigating whether the charge information was incorrect. Insurance companies that contributed data to the Ingenix database did the same. For example, Aetna, which was

Ingenix's single largest data contributor, "pre-scrubbed" its data before submitting it, eliminating the highest 20% of valid medical charges before sending claims data to Ingenix.

87.     Such data manipulation made the distribution of medical charges in Ingenix's UCR databases appear 10-28% lower than they really were.  Any out-of-network claim reimbursement calculations performed using Ingenix's data thus skewed 10-28% lower, resulting in underpayments to health care providers and exposing patents to the risk of balance billing.

88.     Whenever an insurer or Ingenix received an inquiry from a doctor or patient regarding how UCR rates were calculated, they responded, "it's proprietary." Meanwhile, Ingenix did not even attempt to maintain that its UCR data was accurate. As an Ingenix employee testified under oath:

> Ingenix *has never tested its results* to determine if its statistical conclusions bear any relationship to the actual high, low, median or 80th percentile . . . rates charged by health care providers in any given area.

89.     As Ingenix and UnitedHealth would later be forced to admit, Ingenix's close ties with the industry—and its status as a UnitedHealth subsidiary—created "inherent" conflicts of interest.

90.     Several lawsuits were filed against insurers by physicians who were underpaid and by patients who were balance billed as a result of Ingenix's UCR database manipulation.  In 2000, the American Medical Association ("AMA") and several state-specific medical associations filed a class action against UnitedHealth alleging that Ingenix improperly reduced out-of-network reimbursements to healthcare providers in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the antitrust laws.  The suit settled in 2009, with UnitedHealth agreeing to pay $350 million to class members.

### 3.    FAIR Health, Inc.

91.    In February 2008, then-New York Attorney General Andrew Cuomo announced an investigation "into a scheme by health insurers to defraud consumers by manipulating reimbursement rates." Linda Lacewell, the assistant attorney general in charge of that investigation, described Ingenix as "essentially a closed-loop system of the health insurance industry collecting the information among itself, pooling the information together, all relying on the same information, a system that is impenetrable to the consumer." The investigation found, for example, that "[o]ne national insurer filled an entire page with a list of alternative ways in which it purported to calculate out-of-network rates, in language that can best be described as gobbledygook" when, in reality, it simply "pa[id] the same rates for in-network and out-of-network care."

92.    The NYAG investigation culminated in the demise of Ingenix. In January 2009, a settlement was announced between NYAG and UnitedHealth; as part of the deal, UnitedHealth agreed to shut down Ingenix and contribute $50 million to the formation of a new, independent non-profit organization, FAIR Health, Inc. ("FAIR"), to take ownership of the Ingenix UCR database. UnitedHealth further agreed to use FAIR for determining out-of-network reimbursement rates for at least five years, and to refrain from using, owning, operating, or funding any other database for such purpose during that time.

93.    Similar settlements quickly followed for the other major insurers. Aetna agreed to pay $20 million for the creation of FAIR, to contribute untainted data to the new database, and to use FAIR for five years. Cigna and WellPoint, Inc. (later known as Anthem, and then Elevance) agreed to pay $10 million and to use FAIR for five years. Other smaller insurers reached settlement agreements that required them to contribute between $200,000 and $1.6 million and to use FAIR for five years.

94.    FAIR was incorporated in October 2009, and became available for use in mid-2010. Under the terms of its NYAG settlement, UnitedHealth was required to shut

down the Ingenix database within 60 days of the date on which FAIR became available for use. Moreover, UnitedHealth and all other settling insurers were required to begin using FAIR within 60 days of the date on which it became operational, and to use it exclusively for the setting of out-of-network reimbursement rates for a period of at least five years. As FAIR became operational sometime in 2010, the obligation of the settling insurers (including the Insurer Defendants) to use FAIR expired sometime in 2015 or early 2016.

95.    Once UnitedHealth shut down Ingenix, all insurers that had previously used Ingenix (not just those that had settled with NYAG) had to switch to a different data source. Because UnitedHealth had purchased and consolidated the only two databases available a decade earlier (leaving no privately controlled alternatives in the marketplace), FAIR was the obvious and near-universal choice.

96.    FAIR began the gradual process of correcting the skewed UCR database it inherited from UnitedHealth. As FAIR collected more non-manipulated data from insurers (who were required by their settlement agreements to submit accurate, un-scrubbed charge data), the effects of the decades' long scheme to deflate reimbursement rates began to subside.

97.    Over the next seven years, UCR rates rose some 26%. Half of that increase was attributable to cost-of-living increases during that time, but the remainder reflected the normalization of the UCR database and a return to a dataset that accurately reflected prevailing market rates free from manipulation. As a result, patients and physicians received more accurate and fair reimbursements from insurers for the medical care they received or provided. But it did not last.

**C.    Insurers Abandon UCR-Based Claims Pricing in Favor of MultiPlan.**

98.    Unsurprisingly, insurers were not happy with the free market dynamics of the UCR system, particularly when they could no longer manipulate UCR downward through Ingenix. Once the NYAG settlement agreements began to expire, insurers

sought to eliminate UCR entirely, and to replace it with a different methodology that would systematically suppress out-of-network reimbursement rates.  Describing the post-Ingenix world, one MultiPlan executive has explained, "there was a need in the marketplace back in early 2010 . . . to really address what was a feasible allowable [reimbursement amount] in the marketplace on a professional side, to recommend as a payment [for providers]."

99.    Around this time, many insurance executives expressed a desire to use Medicare rates, which are incredibly low, as the new benchmark for setting out-of-network reimbursement levels.  However, these executives understood that absent collusion, using "barebones" Medicare rates as the benchmark would lead to balance billing, create massive member and provider abrasion, and was therefore untenable; in other words, the major insurers would have to undertake such a shift together to ensure its success. MultiPlan would emerge on the scene at precisely this time to offer a vehicle for collusion.

100.    Indeed, the expiration of NYAG settlements opened the door for MultiPlan to become the new "independent" claims repricing service for the insurance industry. And almost immediately after insurers' obligations to use FAIR expired under their agreements with NYAG, the industry abandoned FAIR—and UCR as the primary metric for determining out-of-network reimbursement rates—and instead began using MultiPlan's claims repricing services.

101.    A partial timeline of the 2015-2016 shift from FAIR to MultiPlan is below:

(a) Cigna began using FAIR in 2010.  In 2015, it completed its five-year obligation to use FAIR.  In 2015, it contracted with MultiPlan to use its claims repricing services.

(b) Aetna began using FAIR in 2010. In 2015, it completed its five-year obligation to use FAIR. On May 1, 2015, Aetna contracted with MultiPlan to use its claims repricing services.

(c) UnitedHealth shut down its Ingenix database and began using FAIR by 2011.  In 2016, it completed its five-year

obligation to use FAIR Health. And as UnitedHealth executives have testified , in 2016 UnitedHealth contracted with MultiPlan to use its claims repricing services for parts of its business, and further expanded such use in 2017.

(d) Other insurers also began using MultiPlan to reprice their out-of-network claims around the same time.

102.   The industry's adoption of MultiPlan's claims repricing methodology was rapid, coinciding with the end of the major insurers' five-year commitments to use FAIR. This represented a complex and historically unprecedented change in insurers' out-of-network claims pricing structure, which had, for decades, been based on prevailing (or "usual and customary") market rates for services. Such rapid and concerted industry-wide change in pricing practices was a telltale sign of collusion, and an understanding amongst major insurers that they all had to undertake the shift together to ensure its success.

**D.   The Evolution of MultiPlan's Business.**

**1.   MultiPlan 1.0**

103.   MultiPlan was not always in the claims repricing business. In fact, the company was founded in 1980 as a New York-based hospital network. Over time, MultiPlan expanded its provider and facility footprint. Today, it maintains a nationwide PPO network of over 1.3 million providers, which insurers can "rent" to decrease the number of claims that fall out-of-network. MultiPlan refers to its PPO network business as "MultiPlan 1.0."

104.   To build and maintain its massive PPO network, MultiPlan negotiates with providers and facilities across the country to "establish discounts" for payers "in exchange for patient steerage [to participating providers] and other provider-friendly terms and conditions." MultiPlan then rents out its network to insurers, who, for a fee, get the benefit of the network discounts MultiPlan has negotiated. Insurers can use the MultiPlan PPO as either their primary provider network, or, in the case of larger insurers, to supplement or geographically extend their own preexisting networks. The

terms of MultiPlan's rental arrangements with insurers are set forth in its standard "Network Rental Agreement."

105.    The value of MultiPlan's network—and amount of rent MultiPlan can extract from insurers—is directly tied to the number of providers MultiPlan can convince to participate.  The more providers MultiPlan signs up around the country, the more attractive its rental network becomes to potential insurer clients, and, in turn, the more MultiPlan can charge for access.  For this reason, MultiPlan touts the participation of 1.3 million plus providers in its network as its major "competitive advantage."

106.    To attract providers to its network, MultiPlan must offer competitive reimbursements rates (and other inducements, such as patient steerage). If MultiPlan offers rates (or other terms) that are inferior to what competitor networks offer, it will lose the battle for providers.

107.    In this race for providers, MultiPlan competes against insurers that offer PPO plans and operate their own networks.  Many, if not most, of these insurers, including all of the Insurer Defendants, also hire MultiPlan to perform out-of-network claims repricing services (as detailed further below).  As MultiPlan states in its public filings, MultiPlan "compete[s] with regional PPOs targeting primary network business," and "with PPO networks **owned by [its] large Payor customers**."  In other words, MultiPlan and the insurers are horizontal competitors when it comes to PPO provider coverage, and in the markets for provider services.  The same horizontal competitors then collude to fix the manner in which providers are paid for their services.

108.    MultiPlan induces healthcare providers to join its PPO network—and to obligate themselves to provide services to patients insured by MultiPlan's payer clients—with the promise of sky-high reimbursement rates.  MultiPlan's standard "Participating Provider Agreement" outlines certain "Contract Rates" which are "equal to eighty (80%) percent" of the provider's "[b]ill charges . . . ."  The rates specified in

most standard network agreements are, by contrast, pegged to Medicare rates, and are far lower.

109.    But this promise is illusory.  Unlike bona fide network agreements, which contractually obligate insurers to pay specific amounts to doctors for performing covered services, MultiPlan's Provider Participation Agreement includes no payment obligation whatsoever on the part of any payer.  Instead, it provides that MultiPlan may, "in its sole discretion," rent out its network to insurer clients who may choose *not* to pay the specified "Contract Rates" and instead opt to reimburse the provider based on the "out-of-Network benefit level" specified in the patient's PPO plan.   Specifically, these agreements state:

> [MultiPlan] may, in its sole discretion, include Group and each Participating Professional as a Network Provider in any or all Network(s).   Group and each Participating Professional acknowledge that certain Programs offered by [payer] Clients accessing the Network (i) may not include a network option; or (ii) **may cover Covered Services under the Participant's Program at . . . out-of-Network benefit level**."

110.    MultiPlan knows (but does not disclose to providers) that many, if not most, of the claims submitted by participating providers will be reimbursed not at the specified Contract Rates.  Instead, these claims will be treated by insurers as out-of-network claims and reimbursed at outrageously low levels that MultiPlan itself sets via its "Data iSight" OON claims repricing methodology (which is at the heart of the conspiracy alleged herein).

111.    In fact, MultiPlan ensures as much.  Its standard Network Rental Agreement with insurers essentially allows payers to reimburse MultiPlan network providers however they see fit.  It provides that the insurer may "pay claims from [providers who participate in MultiPlan's PPO network] in accordance with a Member's [*i.e.*, the patient's] plan of benefits (*e.g.*, benefit plans providing benefit levels at Reasonable and Customary, percentage of Medicare, **_or otherwise_**) **_in lieu of_**" the

Contract Rates MultiPlan dangles in front of providers to induce their participation in the MultiPlan network.

112.    Given this reality, MultiPlan's participation agreements with providers may be void for lack of consideration, with providers agreeing to perform services for various insurance plan subscribers with no guarantee of payment. Whether or not this is true, a claim submitted by a MultiPlan participating provider that is treated as an out-of-network claim—otherwise known as a "non-contract" or "retail" claim—is not subject to any contract, much less the MultiPlan Provider Participation Agreement.

113.    Through its network rental business, MultiPlan has aggregated more than 3.5 petabytes of claim and reimbursement data. Such data reflects not only what healthcare providers charge for in-network and non-contracted services, but also what those physicians are willing to accept as payment for those services. MultiPlan refers to this cache of data as the "crown jewels" of its company.

### 2.    MultiPlan 2.0

114.    Just as Ingenix was being investigated for antitrust violations and fraud in the late 2000s, MultiPlan began offering a new service to its insurance company clients: "re-pricing" their out-of-network (or "non-contracted") claims. This is a euphemism for telling insurers how much to pay providers who perform out-of-network services for their subscribers.

115.    In August of 2009, mere months after the rash of NYAG settlements that would shutter Ingenix, MultiPlan announced that it had reached an agreement to acquire the data analytics firm, Viant, Inc.

116.    Viant, like MultiPlan, operated a rental PPO network; but it also offered "non-network cost management services" and a post-payment audit service. The acquisition of Viant thus "added analytics-based services" and "re-pricing solutions" to MultiPlan's business portfolio. The Viant acquisition was completed in 2010.

117.    In June 2011, MultiPlan acquired another company, National Care Network, LLC ("NCN") for $50 million. Around this time, NCN described itself as a

national leader in cost management, boasting powerful data-driven tools and technology solutions. At the time of MultiPlan's acquisition, NCN had a patent application pending for a software program that would become central to the MultiPlan Cartel; that program would eventually be known as "Data iSight."

118.    In December 2014, adding to its so-called analytics-based services portfolio, MultiPlan acquired another company called Medical Audit and Review Solutions (MARS).

119.    Through these acquisitions, MultiPlan became the "leader in out-of-network cost containment." In 2022 alone, MultiPlan processed 546 million out-of-network claims. During that same year, its next closest competitor, Zelis (a company that reprices out-of-network claims based on a UCR benchmark) processed only 2 million out-of-network claims.

120.    Over time, MultiPlan's analytics-based services have contributed an increasing share of the company's annual revenues, now accounting for roughly 70% of total revenues. MultiPlan reported $561 million in 2019 revenues from its analytics-based services, leaping to $713 million by 2022. Meanwhile, MultiPlan's revenues from network-based services dropped from $314 million in 2019 to $245 million in 2022.

121.    For a time, MultiPlan purported to employ several different algorithmic repricing programs, including Viant and Data iSight. However, on information and belief, MultiPlan has consolidated those programs into one. In its 2022 10-K, MultiPlan references Viant only once (in the "corporate history" section) and describes the company's claims re-pricing business as utilizing only one repricing algorithm: the "Data iSight program." Whatever MultiPlan calls its "algorithms" and "solution sets," they all pull data from the same database, operate in the same way, and serve the same function—to facilitate price-fixing in the market for out-of-network provider services.

**E.    MultiPlan's Claims Pricing Services.**

122.    MultiPlan's out-of-network claims repricing services are two-fold: First, MultiPlan makes re-pricing determinations based on its Data iSight program; these

determinations involve both an algorithmic component as well as direct input from MultiPlan personnel, who work with insurers to choose pricing strategies and algorithmic overrides—*i.e.*, rate caps—to fix and standardize rates, and manipulate the market.  Second, MultiPlan negotiates the terms of payment with providers, ensuring that all payments are conditioned on the promise that the provider will not balance bill the patient.  As described below, both of these services are important to the MultiPlan Cartel's ability to fix prices for the industry, while protecting cartel members from competitive harms (like subscriber and provider abrasion).

### 1.    The Data iSight Methodology

123.    The precise method by which MultiPlan sets reimbursement rates is non-public and proprietary.  On information and belief, MultiPlan maintains internal white papers that describe in detail the processes that it uses to reprice out-of-network claims. However, public statements by MultiPlan employees, promotional materials, and U.S. Patent No. 8,103,522 (the "'522 patent," submitted by MultiPlan subsidiary National Care Network, LLC) describe MultiPlan's repricing methodology to some extent.

124.    MultiPlan purports to calculate out-of-network reimbursements based not on a percentage of the prevailing charge rate (*i.e.*, UCR), but on "what people are actually paying within the marketplace" or "typical reimbursement rates."  It calls this methodology "Data iSight."  Insurers who contract with MultiPlan for repricing services automatically send their out-of-network claims to MultiPlan.  Then, for each claim, MultiPlan determines a reimbursement amount based the "amounts generally accepted by providers as payment in full for [like] services."

125.    While MultiPlan dresses up its repricing methodology in technological jargon, it has been forced to admit in legal proceedings that once the algorithm establishes a comparator set, in most cases it simply calculates the "median" payment amount for like services.

126.    According to the '522 patent, the process of establishing a comparator set depends in part on what kind of claim is being repriced.  For an inpatient hospital care

claim, Data iSight uses rDRG values ("refined Diagnosis Related Groups") as benchmarks. rDRG is a system created by the Center for Medicare and Medicaid Studies ("CMS"); it classifies claims according to type of care, severity, and complexity. When repricing an inpatient claim, Data iSight searches the MultiPlan claims database for other bills for the same rDRG value at other "like" hospitals, then makes a cost adjustment based on the treating hospital's wage index, as shown in Figure 2A of the '522 patent, below:



**FIG. 2A**

127.    For outpatient treatment claims, Data iSight uses the Healthcare Common Procedure Coding System (or HCPCS), another CMS-developed system. HCPCS is a collection of standardized codes that represent medical procedures, supplies, products, and services used to facilitate the processing of health insurance claims. Data iSight searches the MultiPlan claims databases for other bills for the same services, on a code-by-code basis, and then makes an adjustment based on the wage index where the treatment was rendered, as shown in Figure 2B of the '522 patent below:



**FIG. 2B**

128.    MultiPlan claims that Data iSight is a highly accurate, fair, and transparent way to calculate rates based on certain reasonable benchmarks.  But in reality, MultiPlan ensures that Data iSight always generates artificially low reimbursement rates.

### a.    MultiPlan pollutes its database.

129.    MultiPlan (like its predecessor, Ingenix) includes in its dataset payments made pursuant to network agreements.  These in-network payments are then fed to Data iSight as comparators, resulting in a "garbage in, garbage out" dynamic.  As discussed above, network rates, which are heavily discounted, do not represent reasonable benchmarks for the reimbursement of out-of-network claims because providers would not offer discounts to payers absent the promise of increased patient volume that comes with network participation.  By intentionally corrupting its database with heavily discounted in-network payments, MultiPlan intentionally suppresses apparent "typical" or "median" reimbursement levels for out-of-network care.

**b.    MultiPlan applies algorithmic overrides.**

130.    MultiPlan's supposedly sophisticated algorithm merely identifies the median payment amount for like services, based on junk data that MultiPlan feeds its database to suppress those median amounts.  However, MultiPlan does not stop there in its efforts to suppress and coordinate industry-wide rates.

131.    For many if not most of its insurer clients (including all of the Insurer Defendants), MultiPlan overrides the algorithm's functioning by instructing payers to enter manual overrides, like caps and floors on payment.  These overrides provide MultiPlan an additional means to control and coordinate insurer behavior, thereby reducing member and provider "abrasion" and accelerating the Cartel's goal of suppressing industry-wide out-of-network reimbursement rates.

132.    How does MultiPlan implement these overrides?  Under MultiPlan's claims repricing services agreements, each insurer client must complete a "Data iSight Client Preferences form."  However, the insurer is not free to independently select these preferences.  Instead, the insurer and MultiPlan must "mutually agree[] upon" certain "business criteria" by which to set such preferences.  In other words, MultiPlan maintains control over these selections.

133.    The available "business criteria" are seven "methods" for setting rates, which are devised by MultiPlan.  Most of these "methods" cap the amount the insurer is willing to pay for a particular service (regardless of what a reasonable payment would be or what the algorithm would otherwise spit out).  For example, one available Data iSight "method" is "[r]eimbursement at which X% of hospitals are profitable."  Under this method, insurers and MultiPlan decide to reimburse at a level at which 50% of hospitals lose money for the service provided—fair and reasonable indeed.  Another method is "[r]eimbursement at X% of Medicare," meaning MultiPlan and the insurer agree to pay no more than a certain percentage of what Medicare pays for a service. The remaining five methods are: "reimbursement at which the average markup is X%"; "reimbursement at X% of cost"; "reimbursement at X% of charges"; "reimbursement at X

percentile of billed charges" (*i.e.*, UCR); and "reimbursement at average of billed charges," as shown below in Table 1 of the '522 patent:

| Available Methods | |
|---|---|
| Fl | Reimbursement at which X % of Hospitals are profitable |
| F2 | Reimbursement at which the average mark-up is X % |
| F3 | Reimbursement at X % of Cost |
| F4 | Reimbursement at X % of Medicare Reimbursement |
| F5 | Reimbursement at X % of Charges |
| F6 | Reimbursement at X Percentile of Billed Charges |
| F7 | Reimbursement at Average Billed Charges |

134.    Data iSight uses these "methods" to formulate an "initial target reimbursement amount" irrespective of the "median" reimbursement rate. This initial target amount largely determines how providers who participate in the MultiPlan network will be reimbursed for claims they submit to MultiPlan's insurer clients.[6] When an insurer receives a claim from a provider that is not part of its own PPO network, the insurer sends the claim to MultiPlan. If the provider is a member of MultiPlan's rental network, MultiPlan calculates the expected payment under that agreement's Contract Rates. But instead of just paying the calculated amount, MultiPlan compares that amount to the "target reimbursement amount," which is essentially an upper limit on payment. If the expected Contract Rate amount is greater than the target, MultiPlan will not pay the Contract Rate and will instead shunt the claim back to Data iSight to be "re-priced" like any other out-of-network claim.

---

[6] As described above, under MultiPlan's nebulous Provider Participation Agreement, doctors are not guaranteed to receive the enticing Contract Rates outlined by MultiPlan. Instead, their claims may be reimbursed in whatever way the insurer and MultiPlan ultimately see fit. In practice, and as contemplated in MultiPlan's network rental agreements with insurers, this means that the purported Contract Rates will be paid only if such rates are below the insurer's "initial target reimbursement amount," which, on information and belief, rarely occurs.

135.    Next, MultiPlan can instruct payers to apply additional overrides to determine the final reimbursement amount.  These overrides include additional "ceiling" and "floors," as shown below in Table 1 of the '522 patent:

| Available Overrides | |
| --- | --- |
| O1 | Don't Pay Less Than X % of Claim's Cost |
| O2 | Don't Pay Less Than X % of Claim's Charge |
| O3 | Don't Pay Less Than X % of Claim's Reimbursement |
| O4 | Don't Pay More Than X % of Claim's Cost |
| O5 | Don't Pay More Than X % of Claim's Charge |
| O6 | Don't Pay More Than X % of Claim's Reimbursement |
| O7 | Don't Pay More Than Billed Charges |

136.    While some of MultiPlan's available "methods" and "overrides" appear to be floors on payment (*e.g.*, "Don't pay less than…."), in reality, these apparent "floors" are almost always paired with "ceilings" ("Don't pay more than…").  By applying both a floor and a ceiling on payment, MultiPlan and the payer functionally decide the exact level at which to set reimbursement rates.

137.    These agreed-upon payment levels are usually pegged to "barebones" Medicare rates (which do not even cover provider costs)—the long-held goal of the insurance industry.  Indeed, between 2019 and 2022, Medicare reimbursements only increased by 7.5% while hospital expenses increased 17.5% over the same period.  Overall, for every $100 a hospital spends to treat a Medicare recipient, Medicare reimburses only $84, which isn't sustainable. Even Medicare-pegged rates that may sound reasonable can strain medical practices.  For example, paying around 120 percent of the government-set Medicare rate "sounds fair, maybe even generous," one MultiPlan document states, but this is "inherently misleading" because "the average consumer does not understand just how low Medicare rates are."  Data iSight's often recommends prices between 160 to 260 percent of Medicare rates, amounts former MultiPlan employees described as "ridiculously low" and "crazy low."

138.    For example, during the process of reaching "mutual agreement" as to the business criteria and overrides to be used to set UnitedHealth's out-of-network reimbursements in 2017, MultiPlan explained that with an "override" of 350% of

1    Medicare rates, UnitedHealth would be "leading the pack," alongside one other

2    competitor, in terms of how low it could drive out-of-network reimbursements.  But an

3    override of 500% of Medicare would put UnitedHealth in line with what the rest of what

4    its main competitors were doing.  This information about competitor pricing practices

5    was competitively sensitive data that would not have been shared among insurers but

6    for operation of the MultiPlan Cartel. And, consistent with the Cartel's goal of reducing

7    industry-wide OON reimbursement rates over time, UnitedHealth reduced its payment

8    ceiling from 500% of Medicare rates in 2016, to 350% in 2018, and 250% thereafter.

9          139.    The rate determinations generated by these overrides often do not take

10   into account geographical differences in the cost of key inputs like labor. Numerous

11   providers have observed that MultiPlan reprices claims submitted to UnitedHealth

12   based on a Medicare benchmark, often with no geographical adjustment.  For example,

13   Freemont Emergency Services (an emergency room physician group that successfully

14   sued UnitedHealth for suppressing out-of-network reimbursements) documented that

15   between January and May of 2019, it submitted identical claims to UnitedHealth for

16   the same service performed in nine different states.  While these bills varied in amount,

17   each was equal to exactly 80% of UCR in the geographical region where the service was

18   performed, as calculated by FAIR Health at the time.  Had these bills been submitted to

19   UnitedHealth during the time in which FAIR was used to set reimbursement rates,

20   each bill would have been paid at exactly the amount charged.  But, after having those

21   claims repriced by MultiPlan, UnitedHealth paid these healthcare providers far less.

22   For each of the nine treatments in nine different states stretching from one coast to

23   another, MultiPlan calculated, and UnitedHealth paid, a reimbursement of exactly

24   $413.39.  This resulted in an underpayment to healthcare providers of between $381.61

25   and $939.61 (or 45% and 70% off of the relevant UCR benchmark).

26          **2.    MultiPlan's Negotiation Services**

27          140.    After determining a payment amount via the Data iSight methodology,

28   MultiPlan negotiates payment with providers.  This negotiation function is critical to

ensuring that all insurers adhere to MultiPlan's payment determinations, and to MultiPlan's ability to orchestrate the conspiracy.

141.    MultiPlan makes offers of payment to providers on a take-it-or-leave-it basis.  Typically, MultiPlan gives medical billers less than ten days to respond to its offers and threatens to drop its reimbursements should providers choose not to accept. In one fax to a healthcare provider, MultiPlan gave the provider eight days to respond to a low-ball offer, warning: "if you do not wish to sign the attached proposal . . . this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient."

142.    If the medical biller tries to negotiate for a higher rate with MultiPlan, MultiPlan says it is not the insurer and does not have authorization to increase the payment offer.  If the biller asks the insurer how MultiPlan reprices its claims, the insurance company explains that it is not responsible for MultiPlan's pricing.

143.    But is not enough to simply force providers to accept the extremely low payment amounts calculated by Data iSight.  To avoid patient backlash and subscriber loss for its insurer clients, MultiPlan must also ensure that providers will not hold patients liable for the remainder of the bill.  So, MultiPlan conditions all offers of payment on the provider's promise not to "bill the Patient, or financial responsible party, for the difference between the Billed Charges and the Proposed Amount [*i.e.*, the payment offer]."

144.    MultiPlan knows it can get away with acting like mafia enforcer for insurers because virtually every commercial healthcare payer has agreed to use its repricing methodology, leaving healthcare providers with no practical option but to accept the "repriced" reimbursement amount that MultiPlan imposes.  Across all claim types, in over 95% of cases, providers accept the initial reimbursement offer made by MultiPlan, and do so, as required, on the condition that they will refrain from balance billing the patient.  The number is even higher, roughly 99.4%, for inpatient claims.

145.    MultiPlan "eliminate[s] balance billing" among the miniscule percent of providers who appeal the initial reimbursement offer by providing "post-payment negotiation" services to payers.  As part of this service, MultiPlan again tells providers that that if they do not accept the offer, they may receive no reimbursement at all.  The vast majority of these appeals result in providers accepting of the MultiPlan offer, again on the condition they will not balance bill the patient.

### 3.    MultiPlan's Contingent Fee Structure.

146.    For each claim MultiPlan reprices, it collects a fee from the insurer based on the difference between the provider's original claim and the amount the provider eventually accepts.  This fee is typically equal to 5-7% of the "savings" obtained by MultiPlan but has been as high as 9.75% in some cases.

147.    MultiPlan is thus highly motivated to calculate the lowest reimbursement rates possible—whether or not "reasonable" or "fair" to the provider.  Indeed, these contingent fees represent the lion's share of the MultiPlan's annual revenues.  In 2021 alone, MultiPlan raked in roughly $709 million in fees for repricing OON claims.

## VII.    DEFENDANTS' ANTICOMPETITIVE SCHEME

148.    A cartel is a group of rivals that conspire to fix prices, allocate markets, or otherwise illegally limit competition.  Cartels can be organized by competing sellers of goods or services (who seek to raise prices to increase their revenues) or by buyers (who seek to suppress prices to reduce their costs).  Either way, the goal of cartel members is the same: to act (collectively) like a monopolist—or in the case of a buyers' cartel, such as the cartel alleged herein, like a monopsonist.

149.    The MultiPlan Cartel is a buyers' cartel dating back to around 2015 (and perhaps earlier) designed to reduce out-of-network claims reimbursement rates.  To achieve this outcome, cartel members agree (among themselves and with MultiPlan, which orchestrates their scheme) to: (1) outsource their competitive decisions with respect to out-of-network reimbursement rates to a common decisionmaker, MultiPlan, and abide by its price determinations, and (2) exchange among themselves and

MultiPlan competitively sensitive information regarding their reimbursement rates and pricing strategies. This joint delegation and anticompetitive information exchange allows MultiPlan to coordinate insurer behavior and minimize industry-wide reimbursement rates.

### A.    MultiPlan invites insurers to participate in collective action.

150.    As a sophisticated market participant, MultiPlan is aware that its out-of-network claims repricing services are attractive to insurers only if insurers perceive an opportunity to collectively adopt the same pricing methodology and negotiation strategy.

151.    It is well understood that a single insurer, acting alone, will face massive subscriber and provider backlash (or "abrasion") if it reimburses out-of-network claims at below-market, Medicare-style rates. Historically, when insurers refused to pay a reasonable rate of reimbursement on out-of-network claims (and used Medicare rates as the reference point), providers would balance bill patients, leading to subscriber complaints, appeals, and departures. Insurers thus understand that to successfully lowball providers (without risking serious economic harm), they must not only force providers to accept low reimbursement rates, but to do so on terms that preclude balance billing, something no individual insurer would have sufficient leverage to do on its own. In other words, it would be against the unilateral economic self-interest of any one insurer to join the MultiPlan Cartel, absent awareness that competitors had agreed to do the same.

152.    MultiPlan offers a solution to this dilemma, inviting insurers to act collectively with respect to their reimbursement decisions and provider interactions. To that end, it markets its platform as a way for insurers to "outsource the repricing" and negotiation of "out-of-network claims" to a single decision-maker, MultiPlan. According to MultiPlan, by delegating these functions to MultiPlan, "[c]ommercial plans of any size" can obtain significant "discounts on out-of-network charges" while ensuring "low provider abrasion" and "minimizing the balance billing of their members." Such

marketing contemplates and invites concerted action among insurers as a means to reduce out-of-network costs. Insurers sacrifice their independent decision-making to a common decisionmaker (MultiPlan) only because they know competitors are doing the same.

153. As part of this scheme, MultiPlan also invites and requires insurers to participate in anticompetitive information sharing. MultiPlan requires each insurer client to submit real-time, non-public pricing information to its database, including:

(1) claims (both in- and out-of-network) received from providers,

(2) reimbursements paid to those providers, and

(3) proprietary pricing preferences and strategies, which MultiPlan solicits (among other ways) through its mandatory "Data iSight Client Preferences form."

154. This pricing information (including the caps and overrides applied by insurers, via mutual agreement with MultiPlan) constitute competitively sensitive information that would not be shared in a competitive market. An insurer equipped with knowledge of a competitor's pricing data and strategies could gain a competitive advantage and seize market share by reimbursing out-of-network providers at higher rates than a lowballing competitor. It would be against the economic self-interest of any independent insurer to share that competitively sensitive data with MultiPlan, for use with its competitors (whether directly or indirectly), unless it knew that its competitors were doing the same. Absent such an assurance, an insurer would be undermining its competitive standing vis-à-vis other insurers.

155. MultiPlan is transparent that the value of its services stems from its ability to harvest competitively sensitive payment data from hundreds of insurance companies, and to use that data to set rates for the entire industry. MultiPlan touts its "incomparable database"—populated with some 135 million claims a year, or "360,000 claims a day," from "700-plus payer customers"—as the single most "impressive" fact

about the company, and the real reason insurers stand to benefit from the decision to "outsource the pricing of [their] out-of-network claims" to MultiPlan.

156.    As one former MultiPlan executive, Paul Galant, signaled to the market on a 2020 earnings call, MultiPlan's ability to collect "claims from 700 payers" made the company's repricing tools "very, very different" from those operated by a "single payer" (such as Naviguard, UnitedHealth's in-house repricing tool).  According to Galant, MultiPlan's access to industry-wide data, rather than its technology, was the reason "why [insurers] all come to MultiPlan" for claims repricing.  And he boasted that MultiPlan's "data advantage" had created a "competitive moat around [the] company that drives recurring revenues."

157.    Galant doubled down on these comments during a Virtual Analyst Day later in 2020.  According to Galant, MultiPlan's value proposition had nothing to do with technology, bluntly stating that anyone can "create their own algorithms."  The MultiPlan "difference," he explained, was that "we see data across 700 payors," enabling the company to "generate bigger savings" for clients and to obtain better concessions from providers in negotiations.  According to this executive, because MultiPlan can "talk to the entire industry"—rather than just one "specific payer"—it was better equipped to "push for savings" than a payer, acting individually, "who decides to do everything on their own."  In other words, MultiPlan could deliver results for insurers because it enabled their collective action.

158.    To attract new cartel members (and ensure the ongoing participation of existing members), MultiPlan regularly announces how many insurers are part of its price-fixing scheme.  In 2020, Mark Tabak, then-CEO of MultiPlan, stated publicly that the company was "the leader in out-of-network cost containment" and had entered into "multi-year contracts with the leading payers" to provide OON claims repricing service. Likewise, in 2023, MultiPlan executives bragged that "all of the top 15 insurers" in the country had agreed to use MultiPlan's out-of-network claims repricing services.

159.    MultiPlan makes the same kinds of representations in private to insurers. For example, MultiPlan's former Chief Revenue Officer, Dale White, induced UnitedHealthcare to join the Cartel in 2016, stating in an email that seven of the insurer's top ten competitors were already using MultiPlan's repricing services. According to the White, "[i]mplementing these initiatives [would] go a long way to bring UnitedHealth back into alignment with its primary competitor group [Blues, Cigna, Aetna] on managing out-of-network costs."  One of the recipients of White's email, UnitedHealthcare executive Rebecca Paradise, would later testify that a key factor in UnitedHealth's decision to use MultiPlan was that it was "widely used by our competitors."  Such statements confirm that concerted action is the point of the MultiPlan Cartel, and that the Insurer Defendants join it precisely because their competitors have also agreed to do so.

160.    White's email to UnitedHealth was nothing more than an invitation to collude.  And it assured UnitedHealth's executives that by joining the collusive scheme, UnitedHealth's OON reimbursements would be "aligned" with those of its competitors, thus enabling the insurer to lowball providers without suffering competitive harms or "abrasion."  This same dynamic has played out with countless other insurers.

**B.    Insurers accept MultiPlan's invitation to collude.**

161.    As MultiPlan regularly boasts, over 700 insurers, including all of the nation's top 15 healthcare payers, have accepted MultiPlan's invitation to participate in concerted action with respect to the pricing of out-of-network claims.  These insurers show their acceptance of MultiPlan's invitation to collude in at least three ways.

**1.    Joint Delegation**

162.    Insurers enter into contracts with MultiPlan through which they delegate to MultiPlan the authority to determine out-of-network reimbursement rates and negotiate those rates with providers to ensure they accept them.  The very act of contracting with a common third party to determine rates and negotiate with providers

signals insurers' conscious commitment to adhere to MultiPlan's price determinations, facilitating their collective action.

163.    Under MultiPlan's OON claims repricing services contracts, insurers agree to set payment preferences through "mutual[] agree[ment]" with MultiPlan, and abide by MultiPlan's "negotiated rates" so long as they are "consistent with the business criteria mutually agreed upon between [the insurer] and MultiPlan." Through these provisions, insurers delegate to MultiPlan control over key business decisions that directly impact reimbursement rates. The fact that all of MultiPlan's insurer clients cede control to MultiPlan in this way enables MultiPlan to orchestrate uniform behavior by each of its insurer clients to achieve their common, illicit goal of suppressing reimbursement rates across the board—a goal from which MultiPlan profits handsomely.

164.    By outsourcing their independent decision-making and negotiation authority to a mutually agreed-upon third party, insurers know that they will not (and cannot) be disciplined by providers for setting ever-lower reimbursement rates. Providers are forced to accept unprecedentedly low reimbursements rates, without recourse to balance billing, because virtually all insurers now use MultiPlan's out-of-network claims repricing services. In other words, healthcare providers have nowhere to turn for better terms, and must deal with MultiPlan or receive no reimbursements at all (and rely solely on payments from patients).

### 2.    Anticompetitive Information Exchange

165.    Insurers provide MultiPlan with copious amounts of competitively sensitive data, including their payment data and payment preferences (including the overrides and caps they enter into Data iSight).

166.    Insurers share this data with MultiPlan because they know that MultiPlan will use it to assist them and their co-conspirators (including through the setting of OON reimbursement rates and the effectuation of pricing strategies). They also

1   participate in information sharing so that they can benefit from the proprietary data

2   their competitors are likewise providing to MultiPlan.

3        167.   MultiPlan's relationship with UnitedHealthcare illustrates how the

4   company leverages insurers' proprietary payment data and pricing strategies to effect

5   its scheme to suppress industry-wide OON prices:

6        168.   In 2016, MultiPlan induced UnitedHealthcare to join the Cartel by

7   representing that its major competitors had already entered into repricing services

8   agreements with MultiPlan.  In 2017, MultiPlan instructed UnitedHealth to pursue a

9   specific, aggressive override strategy, based on what MultiPlan's other insurer clients

10   were doing, that would drive down industry-wide reimbursement rates.  In particular,

11   MultiPlan's Dale White instructed that UnitedHealthcare set out-of-network payments

12   at 350% of Medicare rates, assuring UnitedHealthcare executives that, by agreeing to

13   use this formula, UnitedHealthcare would "be in line with [one] competitor" and

14   "leading the pack along with another competitor."  MultiPlan was aware of the pricing

15   strategies of UnitedHealthcare's competitors because, as MultiPlan clients, they had set

16   those benchmarks via "mutual agreement" with MultiPlan.  MultiPlan then used that

17   information to make a similar instruction to UnitedHealth.  Thus, MultiPlan's role as a

18   clearinghouse for each Insurer Defendant's and each co-conspirator's competitively

19   sensitive and otherwise non-public pricing data is essential to its ability to orchestrate

20   the MultiPlan Cartel, and to bring each Insurer Defendant's and each co-conspirator's

21   practices in alignment with the cartel's overall pricing moves.

22        169.   Against this backdrop, UnitedHealthcare's pricing became increasingly

23   aggressive over time, backed by MultiPlan's assurances that its OON reimbursements

24   were still consistent with industry norms.  Eventually, UnitedHealthcare agreed with

25   MultiPlan to implement a cap of 250% of Medicare rates in Data iSight.  As

26   UnitedHealthcare executives later explained in a Customer Impact Advisory Brief, it

27   was "utilizing Data iSight, owned by MultiPlan, to administer [an outlier cost

28   management program]" and "90 other payors nationwide use [Data iSight] in a similar

manner." UnitedHealthcare's agreement to MultiPlan's proposed cap thus turned on its understanding that its competitors had already entered similar agreements with MultiPlan. Absent that assurance, it, like its competitors, would not enter such an agreement because it would be against their independent economic interests.

170. MultiPlan has leveraged its access to insurers' proprietary data and preferences to orchestrate similar agreements with each of the largest health insurance companies in the United States, which would otherwise be competing amongst themselves for the services of OON providers by paying market rates.

### 3. Adherence to MultiPlan's Pricing Determinations

171. Insurers abide by MultiPlan's price determinations. MultiPlan enforces this outcome through its contracts with insurers. Pursuant to MultiPlan's standard OON claims repricing services contract, the insurer cannot set their reimbursement rates as they see fit. Pricing preferences can only be entered by "mutual agreement" with MultiPlan. Moreover, the insurers' ability to deviate from the Data iSight rate is constrained, as each insurer agrees "not to reduce the . . . provider's rate for claims for which [MultiPlan] has negotiated a rate . . . provided that the negotiated rate is consistent with the business criteria mutually agreed upon between [the insurer] and MultiPlan." The business criteria set by insurers are also informed by MultiPlan's access to and divulging of the competitively sensitive information of other insurers. Because it would be economically irrational for an insurer to pay *more* than a healthcare provider was willing to take, the bar on reducing a provider's rate below what MultiPlan has determined constitutes a tacit agreement by the insurer to pay exactly what MultiPlan instructs it to pay.

172. This tacit agreement is borne out in practice. MultiPlan processes some 370,000 claims per day for its clients. Given this volume, insurers cannot (and do not) independently assess whether MultiPlan's algorithmically adjusted rates are reasonable. Instead, virtually all MultiPlan-generated rates are sent to providers

(usually by MultiPlan itself) with no modification whatsoever on the part of the insurer (or any other form of "human touch").

173.    In some 95-99% of cases, providers accept the MultiPlan generated rates initially offered, on the condition that they will "not . . . bill the Patient, or financially responsible party [*i.e.*, the patient], for the difference between the Billed Charges and the Proposed Amount [offered]."

174.    As a result, the MultiPlan rate determination is the final payment amount in virtually all cases.

**C.    Direct and indirect evidence of the MultiPlan Cartel exists.**

**1.    Direct evidence of a horizontal agreement.**

175.    MultiPlan is a horizontal competitor of the Insurer Defendants, a fact which flows from its position as a nationwide PPO network operator.

176.    As described above, to attract providers to its rental network, MultiPlan must offer them competitive reimbursements rates (and other inducements, such as patient steerage); if MultiPlan offers rates (or other terms) that are inferior to what competitor networks offer, it will lose the battle for providers.

177.    In this contest for providers, MultiPlan competes against insurers that offer PPO plans, including the Insurer Defendants.  Thus, as MultiPlan has admitted in public filings, MultiPlan "compete[s] with regional PPOs targeting primary network business," and "with PPO networks *owned by [its] large Payor customers*."

178.    MultiPlan has entered agreements with some 700 insurers, including the Insurer Defendants, which expressly contemplate that MultiPlan and the insurer will collude to set the reimbursement levels for out-of-network claims. These contracts include an agreement to share proprietary data, to use MultiPlan's repricing technologies to lower payments made on claims for reimbursement by out-of-network healthcare providers, and to allow MultiPlan to negotiate rates with providers to eliminate balance billing.  Several of these contracts are publicly available.

179.    One agreement between MultiPlan and Aetna, for example, provides that the parties must mutually agree upon pricing preferences, and that Aetna will honor rates negotiated by MultiPlan so long as they are "consistent with the business criteria mutually agreed upon between [Aetna] and [MultiPlan]." The parties also agree "[w]here the negotiated amount is less than the original billed charge," MultiPlan must "obtain the provider's signed agreement to the revised amount or secure proper documentation stating no 'balance bill' to the patient except for deductible, co-insurance and non-covered services based on the providers' adjusted price[.]"

**2.    Indirect evidence of a horizontal agreement.**

**a.  Insurers engage in actions which, absent concerted action, would be against their individual economic self-interest.**

180.    As part of the MultiPlan Cartel, each Insurer Defendant engages in numerous actions, which (in the absence of concerted action) would be against their individual economic self-interest, but which, in the context of the scheme, maximize profits for the collective. These "actions against self-interest" are strong circumstantial evidence of a horizontal agreement among insurers to reduce competition for OON providers and suppress reimbursement rates.

181.    First, it would be against the economic self-interest of any individual Insurer Defendant to lowball OON providers (the goal and consequence of using MultiPlan, including through agreements to implement aggressive rate caps) because doing so is well known to cause member and provider "abrasion" and, ultimately, economic harm.  In the absence of collusion, insurers would pay competitive rates to avoid such economic harm, including subscriber dissatisfaction and loss.

182.    Second, it would be against the economic self-interest of any individual Insurer Defendant to pay for MultiPlan's expensive claims re-pricing services when there are far cheaper, comparable services on the market, including but not limited to those offered by FAIR Health, Inc.  Unlike FAIR—which charges insurers a modest, flat annual fee—MultiPlan assesses its clients a fee *for each repriced claim*, which is based

on a percentage of the difference between the billed amount and the sum ultimately paid. For any individual insurer, these contingent fees far exceed the flat annual fee they would have to pay to use FAIR. As such, absent collusion, insurers would not pay MultiPlan's fees and would use FAIR or another cheaper vendor. They only do so because the insurers and MultiPlan, collectively, do much better by essentially dividing their monopsony profits, than they would in a fair, functioning, and competitive market not mired by collusion.

183.   Third, it would be against the economic self-interest of any individual Insurer Defendant (all of which are sophisticated, well-resourced companies) to use MultiPlan when they could simply develop their own internal algorithms to re-price OON claims and avoid paying fees to a third-party vendor altogether. As MultiPlan has itself admitted, anyone can "create their own algorithms." And, in fact, Defendant UnitedHealth did develop such an algorithm, known as Naviguard. However, UnitedHealth scrapped Naviguard in 2020 after MultiPlan made UnitedHealth a sweetheart deal—in the form of a massive contingent fee discount—to remain within the Cartel. Absent collusion, it would have been economically irrational for UnitedHealth to scrap Naviguard after investing the resources necessary to develop it.

184.   Fourth, it would be against the economic self-interest of each Insurer Defendant to share its competitively sensitive and proprietary pricing data and strategies with other insurers through a common third party, unless they knew all other insurers had agreed to do the same. In the absence of concerted action, insurers would not share such information with rivals (through an intermediary or otherwise) because of the risk of competitive harm. After all, competitors could use the information to make superior bids to out-of-network providers and strengthen their PPO networks and plan offerings relative to the competition.

**b.    The market for OON providers is susceptible to the formation, maintenance, and efficacy of a cartel.**

185.    As the Ingenix debacle shows, the insurance industry is characterized by numerous features, sometimes called "plus factors," that render the industry susceptible to collusion and bolster the plausibility of the cartel alleged herein.

186.    First, there are high barriers to entry that make it difficult for new companies to enter the commercial health insurance market with competing plans. These barriers include state and federal regulatory requirements, costs associated with developing physician and patient networks, and developing enough business volume to spread risk.

187.    Second, out-of-network providers face high exit barriers when seeking reimbursement for services they provide.  As noted previously, in the United States, some 90% of all healthcare costs are reimbursed, not by patients, but by third-party payers.  Given this reality—along with laws and regulations limiting the ability of providers to directly bill patients—out-of-network providers generally have no substitutes for where to seek reimbursement but from a patient's insurer.  The only way for out-of-network providers to "exit" this third-party payer system is to refuse to treat patients unless they pay cash, something very few patients can afford.

188.    Third, the market among health insurers is highly concentrated.  In 2022, the American Medical Association ("AMA") found that 86 percent of PPO markets are highly concentrated as calculated under the Herfindahl-Hirschman Index (HHI), a metric used by federal regulators to measure market health with respect to concentration.  The AMA, moreover, found that in 58 percent of metropolitan areas, a single insurer enjoyed a 50 percent or greater market share, with a significant number of metropolitan areas witnessing a single insurer controlling market shares of 70 percent or greater.

189.    Fourth, the claims submitted by out-of-network providers for reimbursement from insurers are relatively fungible.  All claims are submitted using uniform billing codes, no matter the insurer or the provider.  This allows MultiPlan to

1   reprice claims consistently for like claims submitted by providers to different insurers

2   and across different health plans, across the entire country, making it feasible for

3   MultiPlan and the Insurer Defendants to execute their anticompetitive scheme.

4       190.    Fifth, members of the MultiPlan Cartel have had ample opportunities to

5   meet and collude, including at events organized and hosted by MultiPlan itself.  For

6   instance, MultiPlan maintains a Client Advisory Board ("CAB") that hosts lavish,

7   multi-day retreats that bring together executives from competing health insurers

8   (including co-conspirators United, Aetna, Cigna, Humana) to discuss topics such as

9   MultiPlan's ability to deliver cost savings through its programs.  These retreats

10  occurred in 2015, as well as in 2019 and 2021, and possibly at other times.  In 2019,

11  MultiPlan hosted a CAB retreat at a luxury spa in Laguna Beach, California attended

12  by executives from MultiPlan, UnitedHealth, Aetna, Cigna, Humana, several Blue

13  Cross Blue Shield associations, Kaiser, and other insurance companies.  It held a

14  similar event in the same city in 2021.  At these meetings, MultiPlan has seated insurer

15  invitees next to each other, which gives them an opportunity to discuss and join the

16  Cartel.  According to sworn testimony by a UnitedHealth executive, at these events,

17  insurance executives "[t]ypically . . . talk about things they've implemented" using

18  MultiPlan's Data iSight scheme and "other things they're looking at" to reduce out-of-

19  network costs, and share with each other "new information" about their efforts in this

20  regard.  MultiPlan also makes its own presentations concerning cartel members' cost

21  reduction efforts, facilitating the exchange of sensitive, proprietary payment

22  information between rivals.

23      191.    The Insurer Defendants and MultiPlan have had opportunities to collude

24  through other channels as well.  Aetna, Centene, Cigna, CVS Health, Elevance, HCSC,

25  Humana, and other insurers are members of AHIP (formerly, "America's Health

26  Insurance Plans"), a trade organization of insurers that regularly holds conferences and

27  meetings (both public and private).  MultiPlan sponsors and sends representatives to

28  AHIP events.  Numerous executives employed by the Insurer Defendants and their co-

conspirators sit on AHIP's Board of Directors, including: Gail K. Bourdreaux, President and CEO of Elevance; Bruce D. Broussard, President and CEO of Humana; David Cordani, Chairman and CEO of Cigna; Sarah London, CEO of Centene; Karen S. Lynch, President and CEO of CVS Health (the parent company of Aetna);  and Maurice Smith, President, CEO, and Vice Chair of HCSC.

192.   AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in private, closed-door meetings.  In 2023, MultiPlan sponsored AHIP's Annual Conference.  Upon information and belief, MultiPlan representatives attended AHIP's 2023 Annual Conference from June 13-15 in Portland, Oregon.

193.   MultiPlan also engages in "road shows," visiting various insurance companies, including the Insurer Defendants, to provide updates regarding its claims repricing services.  At these road shows, MultiPlan executives (including Dale White and Susan Mohler) have shared with insurers detailed descriptions of Data iSight's repricing methodology, the "savings" achieved by various MultiPlan customers, and recommendations to further reduce out-of-network reimbursements.  During roadshow in the fall of 2021, MultiPlan bragged that it was reducing payments for out-of-network services by 61% to 81%.  Upon information and belief, MultiPlan meets with each of its clients each year at such road shows, which allows the Cartel to be regularly updated and renewed.

194.   MultiPlan also prepares white papers for its claims repricing clients, which include references to the claims repricing strategies adopted by other insurers and instruct them on how to implement the scheme.

## VIII.    RELEVANT MARKET AND MONOPSONY POWER

195.   If a relevant antitrust market needs to be defined, the relevant market is the market for the reimbursement of out-of-network provider services by third-party payers.  The relevant geographic market is the United States.

196.    In this market, healthcare providers like Plaintiff are sellers of out-of-network medical care, while third-party payers like the Insurer Defendants are buyers of those services.  Healthcare providers in this market have no reasonable substitutes for the reimbursements provided by commercial insurers for out-of-network medical services, as balance billing patients is futile or illegal in many if not most instances.

## IX.    FRAUDULENT CONCEALMENT, CONTINUING VIOLATION, AND TOLLING THE STATUTE OF LIMITATIONS

197.    Defendants have affirmatively and fraudulently concealed the conspiracy by various means and methods from its inception.

198.    Defendants did so in at least two ways.  First, they misled Plaintiff and other providers about how reimbursement rates were set.  Second, they actively worked to conceal the conspiracy and ensure its secrecy.

199.    MultiPlan's explanation of its pricing methodology to providers was false and misleading.  Moreover, MultiPlan and the other Defendants intentionally hid from the proposed Class, including Plaintiff, that reimbursement prices were actually determined by use of a shared pricing system that used Defendants' real-time, non-public claims data and combined it with their competitors' real-time, non-public claims data to set out-of-network reimbursement rates.

200.    MultiPlan also made false and misleading statements to conceal that it colluded with and orchestrated insurers (*i.e.*, its competitors) to work in concert to artificially suppress payments to healthcare providers.

201.    MultiPlan and the other Defendants also spent years claiming that reimbursements were derived by algorithm, when in fact they were fixed by the cartel's members.

202.    MultiPlan and Defendants also publicly misrepresented that they did not engage in anticompetitive conduct.  For example, MultiPlan's published Code of Business Conduct and Ethics states that it is "committed to conducting our business

with integrity at all times," and that "only legal and ethical means should be used to gather information about existing and potential competitors."

203. Similarly, Aetna's Code of Conduct provides that employees must "obey all laws and regulations that apply to Aetna's business," "be honest and act with integrity in all of your Aetna business dealings," "must not be part of any conduct . . . that is intended to mislead, manipulate, or take unfair advantage of anyone, or misrepresent Aetna products, services, contract terms or policies to a . . . provider," and "[d]o not agree with representatives of a competing company, or with others, to be part of these or any other practices that may illegally restrain competition: fixing prices . . . ."

204. Cigna's Code of Ethics and Principles of Conduct contain similar misleading information. Cigna says it will "comply with applicable laws" and "will behave ethically." It claims to only "look[] for competitive advantages through legal and ethical business practices," that it "neither accept[s] nor tolerate[s] taking advantage of anyone through, for example, manipulating or misrepresenting information," that it "competes fairly around the world," that it "seek[s] to maintain and grow our business through superior products and services – and not through any improper or anticompetitive business practices" and so "compl[ies] with competition and antitrust laws throughout the world."

205. UnitedHealth's Code of Conduct also instructs employees to "[a]void discussions with competitors that may appear to restrain competition unreasonably," including "[c]ommunications or agreements with competitors regarding . . . provider reimbursement rates . . . ." The Code specifically cautions against sharing information about provider reimbursement rates by competitors. Specifically, it addresses a hypothetical of an Optum Health employee (subsidiary of UnitedHealth): "Q. I work in Optum Health and received a request from a colleague on my old team at UnitedHealthcare for some information related to reimbursement rates of other payers. May I provide the data since we are part of the same company? A. Not without consulting your business Legal Representative or Compliance Officer. Optum Health's

provider businesses contract with competitors of UnitedHealthcare and may receive competitively-sensitive information, which must be protected, and sharing the data requested without review and approval by legal counsel could be a form of unfair competition."

206.    Similarly, Blue Cross Blue Shield of Michigan's Code of Business Conduct provides that the company "strives to conduct its business in a manner that helps maintain a free and competitive market," and that "[a]ctivities that would restrain a competitive market, even artificially, are contrary to that philosophy and to antitrust laws, including: Entering into any agreement or joint conduct with competitors that would harm competition; [. . . ]; Collaborating with a competitor to decide what to pay for services."  It specifically provides that the company should "[n]ever exchange price information or communicate with a competitor about prices, anything that may affect prices, or customers," yet that is exactly what the company does through MultiPlan. Upon information and belief, other Blue Cross affiliates have similar provisions in their codes of conduct and ethics.

207.    Defendants also took steps to conceal the true nature of their anticompetitive arrangement from Plaintiff and the proposed Class.

208.    Defendants engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put Plaintiff or the proposed Class on inquiry notice.

209.    Defendants other than MultiPlan privately submitted their own non-public claims data to MultiPlan, and MultiPlan in turn used its proprietary repricing tools, the details of which remain confidential, to propose reimbursement rates. The inner workings and true nature of this process are secrets that are not shared with providers like Plaintiff and the proposed Class.

210.    Defendants regularly attended invitation-only industry events, including events held and sponsored by MultiPlan, where they discussed behind closed doors how

MultiPlan's repricing tools allowed them to reduce costs by suppressing out-of-network reimbursement rates.

211.   Defendants had private communications and meetings to discuss out-of-network claim repricing, MultiPlan's repricing tools, and use of those tools, including by each Defendant's competitors.

212.   Plaintiff and the proposed Class therefore had neither actual nor constructive knowledge of the facts giving rise to their claim for relief. Plaintiff and the proposed Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of Defendants' conspiracy until shortly before filing this complaint.

213.   Through Defendants' knowing and active concealment of their misconduct, Plaintiff and the proposed Class did not receive information that should have put them, or any reasonable person or provider standing in their shoes, on sufficient notice of collusion worthy of further investigation.

214.   Plaintiff and the proposed Class could not have been on inquiry notice of MultiPlan's scheme and the extent and effect of the MultiPlan Cartel until the New York Times published concerns about MultiPlan's practices, based on recently unsealed confidential documents in other litigation, on April 7, 2024.

215.   Even if notice had arisen earlier, an ordinary person acting reasonably diligently would not have had the time, resources, or specialized training to uncover the misconduct that Plaintiff, through counsel highly experienced in antitrust class action litigation, alleges herein, earlier than May 2024.

216.   Plaintiff exercised reasonable diligence at all times and could not have discovered Defendants' alleged misconduct sooner because of Defendants' deceptive and secretive actions to conceal their misconduct.

217.   Plaintiff filed this claim as soon as it became aware of the anticompetitive conduct alleged herein, in reliance on its counsel's investigation.

218.   Defendants' fraudulent concealment of their wrongful misconduct has tolled and suspended the running of the statute of limitations concerning the claims and rights of action of Plaintiff arising from the conspiracy, including all parts of the class period earlier in time than the four years immediately preceding the date this action was filed.

219.   Defendants' misconduct also constitutes a continuing violation against Plaintiff and the proposed Class.  Although formed before 2020, the conspiracy has continued thereafter.  Defendants continue to engage in the anticompetitive conduct alleged herein and have taken no affirmative steps to withdraw from it or otherwise disavow it.

## X.    ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE

220.   The MultiPlan Cartel directly damages Plaintiff's business and property and restrains competition in the relevant market.  Plaintiff has sustained and continues to sustain economic losses—the full amount of which Plaintiff will calculate after discovery and prove at trial—due to Defendants' artificial suppression of reimbursement rates for out-of-network healthcare services.

221.   But for Defendants' conspiracy to fix the price paid for out-of-network healthcare services, Plaintiff and members of the proposed Class would have received higher reimbursement rates for out-of-network healthcare services.

222.   While the conspiracy continues, Plaintiff and proposed Class members will continue to suffer losses.

223.   The antitrust laws aim to prevent injuries such as those alleged here that stem from a conspiracy among buyers to systematically suppress the price paid for a good or service, such as out-of-network healthcare services.  Agreements to reduce price competition or fix prices violate the antitrust laws.

224.   The outsourcing of both insurers' rate-setting decisions and claims negotiation responsibilities, as well as Defendants' anticompetitive information

exchange, has corrupted the market for out-of-network provider services, replacing independent centers of decision-making with a single effective decisionmaker, MultiPlan, and disrupting the competitive process. Insurers' collective use of MultiPlan's repricing services to set artificially low reimbursement rates subverts the competitive process by depriving the market of "independent centers of decisionmaking" and replacing them with decision-making on prices by one shared pricing "brain."

225.    Economic theory and antitrust jurisprudence show that such joint delegation schemes, particularly when accompanied by information exchange, reduce the intensity of price competition and artificially suppresses compensation below competitive levels.  In recent guidance to human resources professionals, the Department of Justice Antitrust Division ("DOJ") stated that "[s]haring information with competitors about terms and conditions of employment" can be anticompetitive in that it decreases competition below competitive levels by allowing firms to match each other's compensation rather than compete for services by offering additional compensation.

226.    That is precisely what has happened with respect to the prices insurers pay for out-of-network care consumed by their subscribers.  As a result of the MultiPlan Cartel, reimbursement rates provided to healthcare providers, including Plaintiff, for out-of-network claims have been suppressed below competitive levels.

227.    According to an April 2020 study published by the Office of the New York State Comptroller, depending on the service provided, out-of-network reimbursements paid based upon MultiPlan's repricing methodology were 1.5 to 49 times lower than UCR-based reimbursements for the same services.  And whereas prior to 2016, reimbursement rates typically rose over time, since 2016 they have fallen year-over-year.

228.    The suppression of out-of-network reimbursement rates caused by the MultiPlan Cartel also indirectly suppresses in-network rates by undermining the ability of providers to leave insurance networks if in-network rates fall too low, a key form of

1  leverage providers would have in the negotiation of those in-network rates in the

2  absence of the MultiPlan Cartel.  Because of the Cartel, even if providers attempt to

3  leave insurance networks and bill subscribers on an out-of-network basis based on the

4  prevailing market rate, MultiPlan ensures that they will receive reimbursement

5  amounts that are roughly equal to in-network rates and which are unreasonably low.

6  By undermining the economic viability of providers performing services on an out-of-

7  network basis, insurers strip providers of a key form of leverage—the ability to decline

8  network participation if in-network rates are too low—thereby suppressing in-network

9  reimbursement rates.

10      229.    By reason of the unlawful activities alleged herein, Defendants

11 substantially affected interstate trade and commerce throughout the United States, and

12 caused antitrust injury to Plaintiff and members of the proposed Class.

13              **XI.      CLASS ACTION ALLEGATIONS**

14      230.    Plaintiff brings this action on behalf of itself, and all others similarly

15 situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as

16 representatives of the proposed Class, which is defined as follows:

> All healthcare providers and practices in the United States and
> its territories that submitted claims for out-of-network
> healthcare services to any third-party payer that used
> MultiPlan's repricing services, including but not limited to the
> Insurer Defendants (or any division, subsidiary, predecessor,
> agent, or affiliate thereof) before the date of trial in this case,
> and were reimbursed for those claims after MultiPlan's
> "repricing" of such claims.

23 Excluded from the proposed Class are Defendants and third-party payers who used

24 MultiPlan's repricing services (and their officers, directors, management, employees,

25 affiliates, parent companies, and subsidiaries) and all governmental entities.

26      231.    The proposed Class is so numerous that joinder of all members in this

27 action is impracticable.  There are tens of thousands if not hundreds of thousands of

28 members in the proposed Class.

232.    Plaintiff's claims are typical of those of the proposed Class because Plaintiff presses the same legal theories, and seeks to redress the same injury, for itself as for all members of the proposed Class.

233.    Plaintiff and all members of the proposed Class were all injured by the same unlawful conduct, which resulted in all of them receiving lower rates of reimbursement on out-of-network claims than they otherwise would have in a competitive market.

234.    Plaintiff will fairly and adequately protect and represent the interests of the proposed Class.  The interests of the Plaintiff are not antagonistic to the proposed Class.

235.    Questions of law and fact common to the members of the proposed Class predominate over questions, if any, that may affect only individual members.

236.    Defendants have acted and refused to act on grounds generally applicable to members of the proposed Class, such that injunctive and declaratory relief are appropriate with respect to the proposed Class as a whole.

237.    Questions of law and fact common to the proposed Class include but are not limited to:

- whether Defendants have entered into a contract, combination, conspiracy, or common understanding to artificially suppress reimbursement rates for out-of-network claims;

- whether, if Defendants entered into such a contract, combination, conspiracy, or common understanding, that conduct is a *per se* violation of Section 1 of the Sherman Act;

- whether Defendants' conduct has in fact artificially suppressed prices paid on out-of-network claims to members of the proposed Class;

- the proper measure of damages for the proposed Class; and

- the contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

238.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

239.    Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## XII.    CAUSES OF ACTION

### COUNT ONE

**Agreement in Restraint of Trade in Violation of**

**Section 1 of the Sherman Antitrust Act**

240.    Plaintiff incorporates each allegation above as if fully set forth herein.

241.    Plaintiff seeks monetary and injunctive relief on behalf of itself and all other members of the proposed Class under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

242.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the purchase and reimbursement of out-of-network healthcare services for subscribers, and in the sale of health insurance plans.

243.    Beginning in or around 2015, Defendants entered into and engaged in an unlawful contract, combination, or agreement, in restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

244.    Specifically, Defendants have combined to form a cartel to artificially suppress out-of-network reimbursement rates paid to healthcare providers across the

United States and exchanged non-public and competitively sensitive information with one another in order to accomplish that purpose.

245. Defendants' conduct was undertaken with the intent, purpose, and effect of artificially suppressing out-of-network reimbursement rates below the competitive level.

246. Defendants perpetrated this scheme with the specific intent of decreasing reimbursement rates for their own benefit.

247. Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

248. Defendants' Cartel has caused Plaintiff and the proposed Class to suffer damages in the form of artificially suppressed reimbursement rates.

249. The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors in the market for healthcare provider services.

250. In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including as follows:

- The Insurer Defendants provided real-time, private, confidential, and detailed internal claims data to MultiPlan for use in MultiPlan's out-of-network claim repricing tools.

- MultiPlan sold and operated its out-of-network claim repricing tool that repriced the reimbursement rate for out-of-network healthcare services claims.

- Defendants knowingly used the same out-of-network claim repricing tool that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims.

- The Insurer Defendants paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tool.

- The Insurer Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate of out-of-network healthcare claims at the rates recommended by its repricing tool.

- Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tool.

- Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

251.    There are no procompetitive justifications for Defendants' Cartel, and any proffered justifications, to the extent cognizable, could be achieved through less restrictive means.

252.    Defendants' Cartel is unlawful under a *per se* mode of analysis. In the alternative, Defendants' Cartel is unlawful under either a quick look or rule of reason mode of analysis.

253.    As a direct and proximate result of Defendants' unlawful scheme, Plaintiff and the members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

254.    Plaintiffs and the proposed Class are entitled to recover three times the damages sustained by them, interest on those damages, together with reasonable attorney's fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

255.    Plaintiffs and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

### XIII.    PETITION FOR RELIEF

256.    Plaintiff petitions for the following relief:

a)    A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as class counsel;

b)    A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act;

c)    A judgment and order requiring the Defendants to pay damages to Plaintiff and members of the proposed Class, trebled;

d)    An order enjoining the Defendants from engaging in further unlawful conduct;

e)    An award of attorneys' fees and costs;

f)    An award of pre- and post-judgment interest on all amounts awarded; and

g)    Such other and further relief as the Court deems just and equitable.

### XIV.    JURY DEMAND

257.    Plaintiff, on behalf of itself and the proposed Class, demands a jury trial on all issues triable as of right before a jury.

Respectfully submitted,

Dated: May 17, 2024                    By: */s/ Natasha J. Fernández-Silber*

Natasha J. Fernández-Silber (*pro hac vice forthcoming*)*
nfernandezsilber@edelson.com
Julian Zhu (SBN 342744)
jzhu@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

\* Admitted to practice in Michigan and New York

By: */s/ Yaman Salahi* _____

Yaman Salahi (SBN 288752)
ysalahi@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff Panoramic Medicine and the Proposed Class*

### ATTESTATION OF ELECTRONIC SIGNATURE

I hereby attest that pursuant to N.D. Cal. Civil L.R. 5-1(i)(3), I have obtained authorization from the above signatories to file the above-referenced document, and that the above signatories concur in the filing's content.

*/s/ Yaman Salahi* _____
Yaman Salahi